933 F.2d 376
 60 USLW 2060, 119 Lab.Cas. P 10,854,
19 Fed.R.Serv.3d 554,
13 Employee Benefits Ca 2700
 In re MICHIGAN CARPENTERS COUNCIL HEALTH AND WELFARE FUND,
et al., Plaintiffs,
Trustees for Michigan Carpenters Council Health and Welfare
Fund, Plaintiff-Appellee, Cross-Appellant (89-1412),
v.
C.J. ROGERS, INC., a Michigan corporation, et al., Defendants,
Charles J. Rogers Construction, a Michigan corporation,
Defendant-Appellant, Cross-Appellee (89-1411).
 Nos. 89-1411, 89-1412.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 31, 1990.
Decided May 10, 1991.
 
 Edward R. Freeberg (argued), Durant, Freeberg, Schanz & Connelly, Kalamazoo, Mich., for plaintiffs-appellees.
 George R. Hamo, Flint, Mich., Kathleen Solner Pearce, Robert J. Solner (argued), Birmingham, Mich., for defendants-appellants.
 Before KENNEDY, BOGGS and SUHRHEINRICH, Circuit Judges.
 SUHRHEINRICH, Circuit Judge.
 
 
 1
 This case involves an appeal and cross-appeal from a final judgment that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1001-1461, preempted state corporate reorganization law and that various defendants were liable to the plaintiffs below on an "alter ego" theory of liability for contributions owed to the plaintiff trust funds. For the reasons stated below, we AFFIRM in part and with respect to the district court's finding as to liquidated damages, VACATE and REMAND in part.
 
 I.
 FACTS
 
 2
 Plaintiffs are ten voluntary unincorporated trust funds established pursuant to Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 186, and ERISA. The funds provide health, retirement, and education benefits for employee beneficiaries of the defendant corporations. Plaintiffs brought this action to collect $500,000 in alleged arrearages and penalties, and to compel defendants to keep current on their contributions, under collective bargaining agreements which obligated defendants to make periodic contributions for the benefit of their employees. Defendants, who are or were all generally in the construction business, include Charles J. Rogers Construction Company ("Construction"), C.J. Rogers, Inc. ("Inc."), Chas. J. Rogers Excavating, Inc. ("Excavating"), and W.P.M., Inc., all corporations organized under Michigan law; C.J. RogersCooper, a joint venture which operated in Michigan in the mid-1970's; and William H. Leoni, a building contractor who is the president of Inc., Construction, and Excavating; and is also the sole shareholder of LERO Corporation, a holding corporation which owns a majority of the shares of stock of Construction and Excavating.
 
 
 3
 Both Excavating and Construction were incorporated by Charles J. Rogers as small, family-owned and operated corporations. Before 1975, controlling interests in Excavating were held by Charles J. Rogers's two sons, Charles K. Rogers and Lawrence P. Rogers, although other family members held lesser amounts of stock. William H. Leoni had been an employee of Construction since 1952, and, until 1975, held a small block of stock in Excavating.[1]
 
 
 4
 In 1974, Excavating found itself in financial straits and without operating funds. Charles K. and Lawrence P. each agreed to loan Excavating $100,000 in return for promissory notes with face values of the same amount and secured by Excavating's accounts receivable. In addition, Leoni assumed the role of active manager. Difficulties continued and Leoni agreed to buy out the positions of the other shareholders in both Construction and Excavating. It was at this time that LERO Industries, Inc. was incorporated to be a holding company for the stock of the two Rogers' companies. According to the terms of the agreement executed on May 20, 1975, Excavating and Construction agreed to redeem all outstanding shares of their stock for $646,000, and Leoni personally guaranteed the companies' obligations. The agreement further provided that at the closing of the deal, the debts to Charles K. and Lawrence P. would be discharged by payment to them of $50,000 each.
 
 
 5
 Leoni became president of both companies upon the sale and his wife, Joanne, became the owner of 100% of Construction's stock and 98% of Excavating's stock. At this time, Joanne and William Leoni paid the Rogers brothers $50,000 each for the promissory notes pursuant to the terms of the May 20, 1975 contract. Although the agreement itself stated that the notes would be discharged at the time of the closing, the notes were actually assigned to the Leonis, and remained outstanding debts of Excavating. The promissory notes had been, and continued to be, secured by Excavating's accounts receivable.
 
 
 6
 The companies' financial difficulties continued, leading them to petition the Genesee County Circuit Court in Flint, Michigan, in July of 1979 for an arrangement of unsecured creditors pursuant to the Michigan Business Corporation Act, Mich.Comp.Laws Secs. 450.1101-450.2098 ("the Michigan Act"). Under Michigan law, if a three-fourths majority of creditors in value agree to a compromise, and receive the sanction of the court to which application was made, the compromise is binding on all creditors of the corporation. Mich.Comp.Laws Sec. 450.1204. At that time, the state judge enjoined all creditors of Construction and Excavating from filing any suit against the companies to collect debts owed and from enforcing any lien against the defendant companies. Among the numerous unsecured obligations that had become delinquent were contributions owed by defendants to plaintiffs pursuant to collective bargaining agreements between defendants and plaintiff funds.
 
 
 7
 The plan of arrangement filed with the circuit court proposed to pay off the general unsecured creditors over varying periods of time, with a 100% payoff to be made to electing creditors over ten years. In accordance with the state court's order, the two companies notified all of their creditors, both secured and unsecured, of the reorganization and submitted a list of these creditors to the court. The initial plan of arrangement submitted jointly by Excavating and Construction was approved by the required three-fourths majority of the unsecured creditors, and by the state court on March 22, 1980. Plaintiffs received notice of the plan but did not participate in the arrangement.
 
 
 8
 Construction and Excavating were unable to perform the planned compromise and arrangement. A second plan was then proposed in the state court in which the assets of the two companies would be transferred to a new Michigan corporation, C.J. Rogers, Inc. ("Inc."). This new plan was approved by the required three-fourths majority of the unsecured creditors and by the state court. Inc. was incorporated on May 1, 1980. Once again, plaintiffs received notice of the second proposed plan, but did not participate in the arrangement.
 
 
 9
 Inc. was capitalized in the following manner. Both Excavating and Construction sold all of their corporate assets and assigned the accounts receivable, inventory, and uncompleted contracts to Inc. Inc. purchased these assets at their fair market value in consideration for two ten-year secured promissory notes given by Inc. to Excavating and Construction. Construction and Excavating were issued $1 million of preferred stock with an indefinite redemption period as payment for the accounts receivable and inventory. In addition, Joanne Leoni executed a subscription agreement to purchase 200,000 shares of common stock of Inc. for either cash or property. In return, she assigned to Inc. the two promissory notes that she held as assignee of the Rogers brothers. Each of the notes, as previously stated, had a face value of $100,000 and were secured by certain accounts receivable of Excavating. Mrs. Leoni became the sole shareholder of Inc.
 
 
 10
 Inc. called for payment of the subscription agreement on October 14, 1980, the date upon which the circuit court and majority of the new creditors approved the sale of assets to Inc. By this time, the accounts receivable securing the two promissory notes had been paid, thereby fulfilling the precondition to Inc.'s creation. The new plan was approved by a majority of the new creditors and the state court.
 
 
 11
 In May 1983, the plaintiffs filed this action in federal district court seeking unpaid contributions and injunctive relief pursuant to collective bargaining agreements with Construction and Excavating and from Inc. and Leoni as alter-egos of these two companies. On November 20, 1985, the district court rendered its findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a), finding that: (1) defendants were liable to plaintiffs for unpaid contributions, interest, liquidated damages, and attorney fees under 29 U.S.C. Sec. 1132(g)(2)(A), (B), (C) and (D); (2) Inc. was the alter-ego of Construction and Excavating; (3) defendant Leoni was not personally liable for the unpaid contributions; and (4) plaintiffs' liquidated damages claims could not exceed the 20% statutory limit of the delinquent contributions of defendants, and that it was irrelevant what type of assessments--penalty or audit--plaintiffs could have levied against defendants. A final judgment was entered in favor of plaintiffs for unpaid contributions in the amount of $100,904.68, interest in the amount of $96,643.56, liquidated damages in an amount equal to the interest, together with attorney fees, costs, and post judgment interest. The district court denied the defendants' motion to alter or amend the judgment on February 22, 1989.
 
 
 12
 On appeal, the defendants assert that the district court erred in holding that Inc. is liable under an alter-ego theory of liability; in applying ERISA rather than state reorganization provisions; and in refusing to offer equitable relief under 29 U.S.C. Sec. 1132(g)(2)(E). On cross-appeal the plaintiffs allege error in the district court's refusal to find defendant Leoni personally liable. The plaintiffs further allege that the district court erred in holding that the liquidated damages available under 29 U.S.C. Sec. 1132(g) cannot exceed 20% of the total delinquent contributions owed by the defendants. It is also contended that the 20% referred to in this section deals with an annualized figure rather than a flat 20% of the amount of contributions due and owing regardless of the period that has elapsed between the time they were due and the ultimate judgment entered in the case.
 
 II.
 APPELLATE JURISDICTION
 
 13
 An initial matter is the extent to which we may entertain jurisdiction over the appeal and cross-appeal, given that both the notices of appeal in this case merely employ the term "et al." to designate the respective appealing parties. Rule 3(c) of the Federal Rules of Appellate Procedure provides in pertinent part that "[t]he notice of appeal shall specify the party or parties taking the appeal," and further provides that "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal." In Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), the Supreme Court held that use of the term "et al." to designate parties to an appeal fails to comply with the specificity requirement of Rule 3(c), and that this failure creates a jurisdictional bar: "[t]he failure to name a party in a notice of appeal is more than excusable 'informality'; it constitutes a failure of that party to appeal." 487 U.S. at 314, 108 S.Ct. at 314. In Minority Employees v. Tennessee Dep't of Employment Sec., 901 F.2d 1327 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990), we held that, because the failure to specify a party is a jurisdictional defect, we were required to apply the decision in Torres retroactively. Id.
 
 
 14
 The defendants filed their notice of appeal on March 20, 1989. The relevant portion of the caption reads as follows: "MICHIGAN CARPENTERS COUNCIL HEALTH & WELFARE FUND, et al., Plaintiffs, v. CHARLES J. ROGERS CONSTRUCTION COMPANY, et al., Defendants." The body of the notice states as follows: "Notice is hereby given that Defendants, Charles J. Rogers Construction Company, et al., in the above case no. G83-582 CA5, hereby appeal to the United States Court of Appeals for the Sixth Circuit...." Under Torres and Minority Employees, it is clear that the only defendant properly before us in this appeal is Charles J. Rogers Construction Company ("Construction") since it is the only party designated in the caption and body of the notice of appeal.
 
 
 15
 The notice of cross-appeal, which is governed by Rule 4(a)(3) of the Federal Rules of Appellate Procedure, is similarly defective. In the notice of cross-appeal, the caption appears as follows: "TRUSTEES FOR MICHIGAN CARPENTERS' COUNCIL HEALTH AND WELFARE FUND, et al [sic], Plaintiffs, v. CHARLES J. ROGERS CONSTRUCTION CO., et al [sic], Defendant;" and the body of the notice states that "Notice is hereby given that plaintiff TRUSTEES FOR MICHIGAN CARPENTERS COUNCIL HEALTH, [sic] et al, hereby cross-appeals...."[2] Under a Torres and Minority Employees analysis, the notice fails to meet the specificity requirement of Rule 3(c), and therefore "constitutes a failure of that party to appeal." While it could be argued that the specificity requirement of Fed.R.App.P. 3(c) applies only to the initial notice of appeal, we conclude that the broad language of Torres also encompasses Rule 4(a)(3). See Young Radiator Co. v. Celotex Corp., 881 F.2d 1408, 1416 (7th Cir.1989) (noting that the Torres opinion made clear that the requirements of both Rules 3 and 4 must be satisfied as to each party); Stockstill v. Petty Ray Geophysical, 888 F.2d 1493, 1496 (5th Cir.1989) (same). Our jurisdiction over the cross-appeal is therefore restricted to the only named party, the Michigan Carpenters Council Health and Welfare Fund.
 
 
 16
 Having determined that the defendant Construction is the only party properly before us on the appeal, we further find that all issues on appeal are preserved with the exception of the claim that the district court erred in finding that Inc. was the alter ego of Construction and Excavating since Inc. failed to perfect its right to appeal. However, our holdings are subject to the restriction that the outcome affects only Construction. On cross-appeal, all issues raised are preserved, once again with the condition that our findings are applicable only to the Michigan Carpenters Council Health and Welfare Fund (hereinafter "Michigan Carpenters" or "the Fund").
 
 III.
 THE APPEAL
 
 17
 Construction's first argument on appeal is that the district court erred in holding that ERISA preempted Michigan's state corporate reorganization laws. ERISA is a comprehensive statutory framework which governs the administration of private employee pension and benefit plans. Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981). Section 514 of ERISA explicitly preempts state law, providing in pertinent part that "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. Sec. 1144(a). State laws are defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law...." 29 U.S.C. Sec. 1144(c)(1). The preemption provision is designed to " 'provide for a uniform source of law,' " Whitworth Bros. Storage Co. v. Central States, 794 F.2d 221, 233 (6th Cir.) (quoting H.R.Rep. No. 93-533, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4655), cert. denied, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986), and is " 'intended to apply in its broadest sense to all actions of State or local governments,' and to 'reserv[e] to Federal authority the sole power to regulate the field of employee benefit plans.' " Kentucky Laborers District Council Health and Welfare Fund v. Hope, 861 F.2d 1003, 1004 (6th Cir.1988) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 99, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490 (1983)).
 
 
 18
 In Shaw the Supreme Court held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw, 463 U.S. at 96-97, 103 S.Ct. at 2900 (footnote omitted). Thus, not only are "state laws specifically designed to affect employee benefit plans," preempted, Shaw, 463 U.S. at 98, 103 S.Ct. at 2900; but also any law that has any "connection with or reference to" the plan. Pilot Life Ins. v. Dedeaux, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987). See also Hope, 861 F.2d at 1004. The Supreme Court recently reaffirmed this principle in Ingersoll-Rand v. McClendon, --- U.S. ----, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), and FMC Corp. v. Holliday, --- U.S. ----, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (preemption clause is conspicuous for its breadth). See also Mackey v. Lanier, 486 U.S. 825, 829-30, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988). Notwithstanding, the Supreme Court has indicated that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." Shaw, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21; Ingersoll-Rand, --- U.S. at ----, 111 S.Ct. at 483. See, e.g., Mackey, supra (ERISA did not preempt a state's general garnishment statute); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (severance pay statute not preempted); Aetna Life Ins. Co. v. Borges, 869 F.2d 142 (2d Cir.) (state escheat law not preempted), cert. denied, --- U.S. ----, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); Firestone Tire & Rubber Co. v. Neusser, 810 F.2d 550, 556 (6th Cir.1987) (municipal income tax not preempted).
 
 
 19
 Under Michigan law, a corporation may include in its articles of incorporation a provision which allows the corporation or a creditor or shareholder thereof, upon proposal that a compromise or arrangement plan of reorganization be effectuated between any of the parties, to apply to a court of equity jurisdiction within the state to order a meeting of the creditors or class of creditors, or shareholders or class of shareholders to be affected by the proposed compromise or reorganization. Mich.Comp.Laws Sec. 450.1204. The statute further provides that:
 
 
 20
 If a majority in number representing 3/4 in value of the creditors or class of creditors ... to be affected by the proposed compromise or arrangement or a reorganization, agree to a compromise, or arrangement or a reorganization of this corporation as a consequence of the compromise or arrangement, ... if sanctioned by the court ... shall be binding on all the creditors or class of creditors ... and also on this corporation.
 
 
 21
 Id. Section 205 states that when the provision of Section 204 (Mich.Comp.Laws Sec. 450.1204) is included in the original articles of incorporation or added by amendment, all persons who become creditors or shareholders thereof are bound by the provision. Mich.Comp.Laws Sec. 450.1205. Once a plan of reorganization has been confirmed by the judgment of a court of competent jurisdiction, Section 861 of the Michigan Act authorizes the manner in which the plan or reorganization may be carried out. It states that such action by the corporation "may be taken, as directed in the judgment, by the receiver or trustee of the corporation appointed in the reorganization proceedings, or by any other person designated by the court." Mich.Comp.Laws Sec. 450.1861. Finally, Section 862 creates and defines the powers of corporation under the judicially confirmed plan of reorganization. Mich.Comp.Laws Sec. 450.1862.
 
 A.
 1.
 
 22
 It is Construction's contention that the state corporate reorganization laws are not preempted by ERISA because they are not inconsistent with any specific ERISA provisions and therefore do not defeat ERISA's purpose of providing for the uniform administration of employee benefit plans. Specifically, Construction argues that because ERISA is silent as to debtor-creditor relationships when a plan is solvent, it does not hinder the uniform application of an administrative scheme such as a state court reorganization plan.
 
 
 23
 In support of its argument, Construction points out that ERISA contains specific legislation to regulate employer withdrawals from multiemployer pension plans. See Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. Sec. 1381. Thus, from apparent congressional silence on the issue of debtor-creditor relations when the parties are solvent, Construction asks us to infer that such state regulation is permissible. This argument draws its force from Mackey, supra, where the Supreme Court held that a generally applicable state garnishment law allowing creditors to garnish ERISA welfare benefits was not preempted. Noting that only pension funds were protected from garnishment, the Court held that it could be inferred from congressional silence that the legislature did not intend to extend a similar protection for welfare benefits. Id.
 
 
 24
 We do not find the instant situation analogous to Mackey. Construction's argument ignores the explicit language of section 515 of ERISA, which provides that every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or collective bargaining agreement, "shall to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. Sec. 1145 (emphasis added). Further, pursuant to section 502(g), 29 U.S.C. Sec. 1132(g), a trustee of a plan may bring an action in federal district court to enforce those obligations. The requirement of Sec. 515 is mandatory and unconditional. We therefore find that the Michigan Act conflicts directly with the provision to the extent it allows an employer unilaterally to alter its obligation to the plan in contravention of the contractually agreed-upon terms. Nor does the fact that MPPAA regulates employer withdrawals from multiemployer plans advance Construction's argument. To the extent Congress wished to allow an employer to alter his obligation to a plan it enacted the MPPAA, which provides a comprehensive statutory scheme regulating employer withdrawals from multiemployer plans.[3] We do not believe that an employer can avoid these stringent requirements through mechanisms created by state law.
 
 
 25
 Nor are we persuaded by Construction's citation to Fort Halifax Packing, supra, (Maine statute requiring a one-time severance payment to employees in the event of plant closings not preempted because it neither established nor required an employer to maintain an employee welfare benefit plan, and involved little more than a conditional one time obligation of writing a lump sum check); Borges, supra, (application of Connecticut's escheat law to ERISA covered benefit checks and drafts that had been issued but not collected not preempted because state law had no effect on insurance company's original determination of eligibility for benefits and economic and administrative effect was therefore not substantial enough to warrant preemption); or Deiches v. Carpenters' Health & Welfare Fund of Philadelphia, 572 F.Supp. 766 (D.N.J.1983) (New Jersey preference statute which allowed a receiver of an insolvent employer to avoid a preferential transfer of delinquent contributions owed to a welfare trust fund not preempted by ERISA since statute merely required return of certain employer's contributions to a plan and did not have any effect upon the rules, procedures or policies of the ERISA plan). Unlike those cases, each of which found that the effect of state laws on ERISA plans was too tenuous or remote to warrant preemption, we conclude that the application of the Michigan Act to the Fund would have a substantial ongoing effect on the administration of the employee benefit plan affected by such an arrangement. Rather than having the amount of contributions owed by the employer determined by the plan's trustee in accordance with the parties' agreements and applicable federal law, the state provisions in essence shift those decisions to the administrator of the corporate compromise or reorganization. The amount of contributions received would therefore be subject to the presumably precarious financial condition of the reorganized corporation; and would necessarily affect the plan's ability to calculate benefit levels, make disbursements, and monitor the availability of funds for benefit payments. See Fort Halifax Packing, supra, 482 U.S. at 9, 107 S.Ct. at 2216. Thus, we conclude that the district court did not err in treating the Michigan Act as preempted by ERISA.
 
 2.
 
 26
 In the alternative, Construction argues that the Michigan Act falls within an exception to ERISA preemption under the "savings" clause, 29 U.S.C. Sec. 1144(b)(2)(A), which provides:
 
 
 27
 Except as provided in subparagraph (B),[4] nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.
 
 
 28
 Construction contends that because a reorganization or compromise effectuated pursuant to the Michigan reorganization provisions affects the rights of shareholders, noteholders, and holders of other debt instruments, all of which are classified as securities, the provisions "regulate ... securities." In support, Construction cites the definitional section of ERISA, which incorporates the definition of "security" found in 15 U.S.C. Sec. 77b(1) of the Federal Securities Act of 1933.
 
 
 29
 Construction's argument is without merit. Undisputedly, the provisions of the Michigan Act "relate to" and "affect" securities since the Michigan Act applies to corporations, which are financed by "securities" as broadly defined. Thus, any statutory provision which redefines a creditor's right in a corporation necessarily has an impact upon "securities." That is not to say, however, that the Michigan Act was designed to "regulate securities." To the contrary, the express purposes of the Michigan Act are to simplify and modernize the law governing business corporations; provide a general corporate form for the conduct or promotion of a lawful business; and to give special recognition to the legitimate needs of close corporations. Mich.Comp.Laws Sec. 450.1103. Moreover, Michigan has adopted the Michigan Uniform Securities Act, which became effective January 1, 1985.[5] This legislation " 'is designed to protect the public against fraud and deception in the issuance, sale, exchange, or disposition of securities within the State of Michigan by requiring the registration of certain securities and transactions.' " People v. Dempster, 396 Mich. 700, 704, 242 N.W.2d 381 (1976) (quoting Schmidt & Cavitch, MICHIGAN CORPORATION LAW, 1071 (1974). Thus it is clear that the Michigan Act does not "regulate securities" within the meaning of the savings clause.
 
 B.
 
 30
 Construction's second argument on appeal is that the district court erred in refusing to grant it "other equitable relief" pursuant to 29 U.S.C. Sec. 1132(g)(2)(E). The section provides in pertinent part that in any action brought by a fiduciary on behalf of a plan to enforce section 1145, the court shall award the plan "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. Sec. 1132(g)(2)(E). Specifically, Construction argues that the district court failed to give appropriate equitable relief by refusing to assume jurisdiction over the state reorganization plan, and by awarding the plaintiff funds full return of their claims of unpaid contributions, interest, liquidated damages, costs and attorney fees; a recovery four to five times greater than other unsecured creditors of Construction and Excavating will receive on their claims. First, it is clear from the unequivocal language of section 1132(g)(2)(E) that equitable relief is discretionary. To paraphrase the section, the district court is not required to grant equitable relief unless and until it deems equitable relief appropriate. Second, given our disposition of the preemption issue on appeal, and the liquidated damages issue on cross-appeal, we conclude that the district court did not err in denying equitable relief.
 
 IV.
 THE CROSS APPEAL
 A.
 
 31
 On cross-appeal, Michigan Carpenters argues that the district court erred in refusing to "pierce the corporate veil" to find defendant William Leoni personally liable for the willful signing of collective bargaining agreements on behalf of inactive businesses, and for improperly transferring company assets from Construction and Excavating to Mrs. Leoni for capitalization of Inc.
 
 
 32
 A corporation is presumed to be a separate entity from its shareholders. Laborers' Pension Trust Fund v. Sydney Weinberger Homes, 872 F.2d 702, 704 (6th Cir.1988) (citing Contractors, Laborers, Teamsters & Engineers Health and Welfare Plan v. Hroch, 757 F.2d 184, 190 (8th Cir.1985)). The corporate veil may be pierced, however, if the court finds " 'substantial reasons for doing so' " after weighing the following factors: "(1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators." Weinberger Homes, 872 F.2d at 704 (citation omitted).[6] This court has also noted that "deference to the corporate form may be particularly inappropriate in relation to ERISA because Congress enacted ERISA in part to protect employees who were being deprived of anticipated benefits by a corporate sham." Weinberger Homes, 872 F.2d at 705 (citing Alman v. Danin, 801 F.2d 1, 3-4 (1st Cir.1986)).
 
 
 33
 On appeal, we review the district court's findings of fact under a clearly erroneous standard of review. Fed.R.Civ.P. 52; Anderson v. City of Bessemer, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74, 105 S.Ct. at 1511. When findings of fact are based upon assessments of witness credibility, "even greater deference" to the finder of fact is warranted, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575, 105 S.Ct. at 1512.
 
 
 34
 In support of its claim, Michigan Carpenters contends first that on several occasions defendant Leoni intentionally signed the wrong corporate entity to a collective bargaining agreement. The plaintiff claims that in November 1980, Leoni signed collective bargaining agreements under the names of the old companies, Excavating and Construction, with full knowledge that these companies had been inactive since May 1980. It is further alleged that on February 6, 1981, Leoni personally signed the collective bargaining agreement for defendant Excavating when he knew the company was not in business. Michigan Carpenters also alleges that Leoni clearly testified that his purpose was to gain "an advantage for the company," which the plaintiff argues was that the company would later claim that no such agreement existed and therefore no fringe benefits were owed.
 
 
 35
 At trial, Leoni testified that the union's business manager, Gerald R. Hall, requested him to sign the agreement for "Rogers, Inc.", and that he did so with full knowledge that the company was dormant and not actively in business. It was Leoni's position that this contract, executed on behalf of Excavating, should not bind Inc. Hall, on the other hand, testified that he had asked Leoni to sign on behalf of the "new Rogers company." The district court noted that if Hall's testimony were fully credited, it tended to show that Leoni knowingly attempted to deceive Hall by signing for a company which Leoni knew was not active. The court observed, however, that Hall later testified that he believed Leoni to be a man of his word and did not believe Leoni set up Inc. to evade his fringe obligations. In addition, Hall testified that he knew a new Rogers company had been formed and that he believed "Chas. J. Rogers Inc." was the name of the new company, but that he never asked, nor did Leoni inform him of the new company's name. Hall also stated that he had seen paychecks with the names "Chas. J. Rogers Inc." and "C.J. Rogers Inc." during the period of April to September 1980. Furthermore, Hall testified that it would have been reasonable for Leoni to assume that he, Hall, knew as of February 1981, that C.J. Rogers, Inc. was the name of the new company.
 
 
 36
 On the basis of this testimony, the district court held that the plaintiffs below failed to show that Leoni acted with specific intent to deceive Hall. The court found that despite the plaintiffs' emphasis on Leoni's willingness to take advantage of Hall's ignorance of the new company's name in order to avoid creating contractual obligations for the new Inc., Hall himself conceded the adversarial nature of employer-union relationships. The court also stated in light of the confusion which attended Inc.'s creation, it was not surprising that Hall might have been confused as to the name of the new corporation, and that he might very well have asked Leoni to sign for Excavating, although intending to sign up Inc. The court further held that it was not implausible that Leoni sincerely believed Hall to be requesting a contract with Excavating, as various witnesses testified that, although dormant, the two old companies could indeed recommence active operations. Thus, the court was unwilling to find fraud from "what may be characterized as sharp business practices, especially where there may have been some negligence on the part of Hall in not knowing the correct name of the entity with which he was trying to secure a contract." Upon review of the record, we find that the district court's findings of fact are supported by the record as a whole, and are not clearly erroneous. Moreover, we are especially hesitant to set aside the district court's findings when they are based on credibility determinations of the witnesses. Anderson, supra, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 37
 Next, Michigan Carpenters asserts that Leoni testified falsely before the state court judge that he was the sole shareholder of Excavating and Construction, since he owned slightly less than 100% of the shares of each company. With respect to this allegation, the district court noted also that witness Rene Ortlieb, the attorney who represented Construction, Excavating and Inc. during the state court reorganization, in his statements to the state court judge, also referred to Leoni as the "sole shareholder." The district court found that this was not a material misrepresentation, since the state court judge was attempting to elicit from Leoni concurrence in the representations made that day by Ortlieb, the majority of which concerned other details of the reorganization. We find no basis in the record to disturb that finding.
 
 
 38
 Michigan Carpenters' third contention is that during the reorganization, the defendants obtained a restraining order preventing all creditors from collecting obligations owed by the various defendants, and that while that order was in effect, defendant Leoni, according to his own testimony, paid over to Inc. for the benefit of Mrs. Leoni approximately $200,000 from the accounts receivable of the old companies, which she now claims is her capital contribution to Inc. The Fund contends that not only did Mrs. Leoni not file a claim with the state court, she was not even listed as a creditor. It argues that defendant Leoni's own exhibit reflects that the note was cancelled at the real estate closing in 1975. In addition, Michigan Carpenters asserts that even if Mrs. Leoni did receive the note, it was unenforceable and therefore invalid consideration for the new stock, since at the time it was paid in September 1980 it was not enforceable under the applicable statute of limitations. Finally, the Fund points out that the note in question had been carried on the corporate books as a "note payable--officer", that Mrs. Leoni was never an officer, and that the note was payable to husband and wife.
 
 
 39
 We find no support in the record for the Fund's argument. The initial order signed by the state court judge enjoined all creditors from enforcing their debts "until further order of the Court." There was testimony at trial that the restraining order was issued in part to allow the companies to work out a plan of arrangement. The state court approved the proposal to create Inc. at a hearing held on October 14, 1980, based on representations by Ortlieb that all creditors had been apprised of the proposal and that most had approved. The district court specifically found that the Oversight Committee's recommendation to the state court judge to approve the sale of assets was based on full knowledge of the transaction by which the notes were assigned. The court based this conclusion on testimony elicited from the accountant who prepared the financial statements of the two companies during the pertinent time period, the attorney who was responsible for the mechanics of Inc.'s incorporation and the attorney for the Oversight Committee. With regard to the plaintiffs' contention that these notes were surreptitiously diverted to Inc. without the knowledge or consent of the creditors or the state court, the district court found, and we agree, that:
 
 
 40
 [T]he evidence simply does not support that claim; if anything, the evidence solidly supports the finding that the transaction was scrupulously monitored by the creditors of the two companies and that their financial affairs were laid naked to all who had an interest in them. It simply strains credibility to find that the attorneys, accountants, and the large creditors, were unaware of the transaction, or, which must be plaintiffs' theory, that they somehow conspired to divert the notes to the Leonis' benefit.
 
 
 41
 Further, testimony at trial indicated that the notation "note payable--officer" was made as an accounting convention. As correctly noted by the district court, the fact that the statute of limitations had run on the two demand notes did not erase the debt but merely prevented the creditor from enforcing his rights. See A. Corbin, CORBIN ON CONTRACTS Sec. 8 (1963) (stating that a perfectly valid contract may become unenforceable by virtue of the statute of limitations but that the expiration of the period fixed by the statute does not make such a contract void but merely unenforceable).
 
 
 42
 Finally, the district court also found as to Inc. that the evidence showed that it was adequately capitalized. In reaching this conclusion the court relied on the testimony of a corporate law expert that the $200,000 invested by Mrs. Leoni was sufficient capitalization for Inc., since it allowed the company to obtain minimal bonding. Further, the district court stated that the $200,000 investment plus Inc.'s deferred-free credit rating enabled it to prequalify for $20 million dollars worth of state work. The plaintiffs offered no rebuttal testimony. In light of the foregoing, we find no basis for reversing the district court's decision with respect to defendant Leoni.
 
 B.
 
 43
 Michigan Carpenters' second issue on cross-appeal pertains to the district court's ruling on liquidated damages. Plaintiffs argued below that unpaid contributions in the amount of $187,363.73 and liquidated damages representing both late payments and audit assessments in the amount of $284,594.00 were due and owing. The district court noted that the liquidated damages requested by the plaintiffs would amount to roughly 150% of the unpaid contributions. It ruled that such an amount was in excess of that permitted by 29 U.S.C. Sec. 1132(g), since liquidated damages may not exceed 20% of unpaid contributions. The district court also held that it was irrelevant what type of assessment--late payment or audit--plaintiffs might have levied against the defendants, because the effect was still the same.
 
 
 44
 In its findings of fact and conclusions of law the district court did not determine exactly how much was owed by whom, which particular contracts were binding upon which company, or make findings regarding whether in some instances the contributions had in fact been paid. Instead, the court simply asked the parties to submit itemized statements of damages, interest, and liquidated damages pursuant to the court's rulings and 29 U.S.C. Sec. 1132(g)(2). After adjustments not relevant to the instant appeal, the court awarded unpaid contributions in the amount of $100,904.68, prejudgment interest on the unpaid contributions in the amount of $96,643.56, and an amount equal to the interest as liquidated damages.
 
 
 45
 On cross-appeal Michigan Carpenters argues that the late payment assessments requested are for contributions that were voluntarily, but untimely, made by the defendants. Thus, the underlying contributions against which the late payments are assessed are allegedly not a part of the court's "unpaid contribution" figure. Likewise, Michigan Carpenters asserts that the audit assessments are also based on contributions that in some instances have already been made. Michigan Carpenters therefore claims that its right to collect these amounts is independent of its right to collect liquidated damages on the unpaid contributions mandated by 29 U.S.C. Sec. 1132(g)(2)(C).[7]
 
 
 46
 Michigan Carpenters' allegations require us to determine whether the Fund is entitled to liquidated damages in the form of audit or late payment assessments--in addition to those authorized by section 1132(g). Before we can determine whether the Fund is entitled to contributions outside of section 1132(g), we must analyze the scope of the term "unpaid contributions" as it is found in that section. Statutory interpretation is a question of law subject to a de novo review by this court. In re Vause 886 F.2d 794, 798 (6th Cir.1989). In construing the statute, we must attempt to "ascertain the intent of Congress." Id. (citation omitted).
 
 
 47
 Sections 502 and 515 of ERISA, 29 U.S.C. Secs. 1132 and 1145, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), Pub.L. No. 96-364, 94 Stat. 1208 (codified in scattered sections of 5, 26, & 29 U.S.C.) of 1980, Secs. 1132(g) and 1145, govern the enforcement of employer contributions to employee pension and welfare trust funds. These sections provide a statutory remedy for a trust fund fiduciary suing to collect unpaid plan contributions and are designed to " 'promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.' " Central States, Southeast and Southwest Areas Pension Fund v. Alco Express Co., 522 F.Supp. 919, 928 (E.D.Mich.1981) (quoting Staff of Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess., S. 1076, The Multiemployer Pension Plan Amendments of 1980: Summary and Analysis of Consideration (Comm.Print.1980) at 43-44).
 
 Section 515 provides:
 
 48
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 49
 29 U.S.C. Sec. 1145. Section 515 is reinforced by the remedial provisions of ERISA section 502(g):
 
 
 50
 (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--
 
 
 51
 (A) the unpaid contributions,
 
 
 52
 (B) interest on the unpaid contributions,
 
 
 53
 (C) an amount equal to the greater of
 
 
 54
 (i) interest on the unpaid contributions, or
 
 
 55
 (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
 
 
 56
 (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
 
 
 57
 (E) such other legal or equitable relief as the court deems appropriate.
 
 
 58
 For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.
 
 
 59
 29 U.S.C. Sec. 1132(g)(2) (emphasis added).
 
 
 60
 The language of Section 1132(g) is mandatory, and once the provision applies, the district court must award liquidated damages. See, e.g., Idaho Plumbers & Pipefitters v. United Mechanical Contractors, Inc., 875 F.2d 212, 215 (9th Cir.1989); Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1156 (7th Cir.1989); Amalgamated Ins. Fund v. Sheldon Hall Clothing, 862 F.2d 1020, 1023 (3d Cir.1988), cert. denied, 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989); Penn Elastic Co. v. United Retail & Wholesale Corp., 792 F.2d 45, 47 (3d Cir.1986). The section provides that upon "a judgment in favor of the plan" the court shall award the plan "the unpaid contributions" and "interest on the unpaid contributions." 29 U.S.C. Sec. 1132(g)(2)(A) & (B). Thus it is clear that the provisions of that section apply only if there were unpaid contributions on the date of the award. In reaching this conclusion we reject the decisions of those courts which state, often in dicta, that the provisions of section 1132(g)(2) apply at the time suit is filed. See, Idaho Plumbers & Pipefitters, 875 F.2d at 215; Carpenters & Joiners Welfare Fund v. Gittleman Corp., 857 F.2d 476, 478 (8th Cir.1988); Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Building Tech. Inc., 747 F.Supp. 288 (E.D.Pa.1990); Bennett v. Machined Metals Co., 591 F.Supp. 600, 605-06 (E.D.Pa.1984); Trustees of the Glaziers Local 963 Pension, Welfare and Apprentice Funds v. Walker and Laberge Co.. Inc., 619 F.Supp. 1402, 1405 (D.C.Md.1985). See also Carpenters Amended and Restated Health Benefit Fund v. John Ryan Construction Co., 767 F.2d 1170, 1174 (5th Cir.1985) (reasoning that a "judgment in favor of the plan" included district court's judgment in plans' favor on ancillary points so as to trigger mandatory assessment of interest, penalty, and attorney fees where plans sought both unpaid contributions and ancillary relief, despite the fact that the employer paid the delinquent contributions before judgment).
 
 
 61
 We further hold that as to liquidated damage assessments which are keyed to these "unpaid contributions," the remedy offered by section 1132(g) is exclusive. To recover liquidated damages outside of and in addition to the statutory framework of section 502(g) with its 20% limitation would allow a more expansive remedy than that authorized by the Congress. Thus, to the extent that the Fund's late payment and audit assessment figures reflect assessments based upon contributions which were still unpaid at the time judgment was awarded, recovery of these amounts is barred, and the Fund's recovery is limited to those liquidated damages allowed under section 1132(g)(2).
 
 
 62
 This returns us to the precise issue raised by Michigan Carpenters: whether Michigan Carpenters is entitled to late payment or audit damages which reflect assessments based on contributions which were untimely, but ultimately paid prior to judgment.[8] Section 1132(g)(2) does not explicitly cover this situation. Each case which has dealt with the issue has held that delinquent contributions do not qualify as "unpaid contributions" and liquidated damages are not recoverable under 29 U.S.C. Sec. 1132(g)(2)(C)(ii). See Idaho Plumbers, supra; Gittleman, supra; Building Tech., supra; Glaziers, supra; Bennett, supra. In Gittleman, the Eighth Circuit further ruled that liquidated damages were also not recoverable under a collective bargaining agreement on the grounds that "[t]he detail and comprehensiveness of the section 1132(g)(2) remedy supports the conclusion that it was meant to supplant any remedy that otherwise would be available." 857 F.2d at 479 (internal quotation omitted). By contrast, in Glaziers, the district court held that liquidated damages for all contributions paid in an untimely manner were recoverable as mandated by the operative collective bargaining agreements. 619 F.Supp. at 1805. The court did not discuss ERISA preemption. In Bennett, the court held that the plaintiff plans were not entitled to liquidated damages on untimely contributions, declining to extend section 1132(g)(2)(C)(ii) to untimely payments. 591 F.Supp. at 605-06. The court did not discuss a contractual theory of liability.
 
 
 63
 The most comprehensive treatment of this issue is found in the Ninth Circuit's decision in Idaho Plumbers, supra. There the court concluded that federal common law principles apply to determine the enforceability of a liquidated damages provision under a labor agreement. 875 F.2d at 216. The Ninth Circuit reasoned that the language of section 1132(g)(2) did not necessarily suggest that Congress intended it to provide the only basis for recovering liquidated damages and looked to the legislative history to resolve ambiguities about the effect of section 1132(g)(2) on the common law of liquidated damages. Id. The court relied on the following House Committee Report commenting on H.R. 3904, the House version of the bill, where the committee stated in pertinent part: "The Committee amendment does not change any other type of remedy permitted under State or Federal law with respect to delinquent multiemployer plan contributions." Idaho Plumbers, 875 F.2d at 216-17 (quoting H.R.Rep. No. 869, 96th Cong., 2d Sess. (1980) (Part II), reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 3037-38) (emphasis supplied by Idaho Plumbers court). See also 126 Cong.Rec. H7899 (daily ed. Aug. 16, 1980) (statement of Representative Thompson). The court therefore concluded that "Congress intended only to preempt laws limiting liquidated damages to an amount below the 20% level when the terms of section 1132(g)(2) are satisfied." Id. at 217. (emphasis in original). See also Central States, 522 F.Supp. at 928 (quoting remarks of Representative Thompson regarding H.R. 3904 in the floor debate of the House).
 
 
 64
 We agree with the reasoning and conclusion of the Ninth Circuit in Idaho Plumbers that a fund has a valid claim for late payment and/or audit damages pursuant to its collective bargaining agreements with defendants, not covered by section 1132(g). We caution, however, that in assessing liquidated damages to those contributions not covered by section 1132(g)(2), the district court should examine whether the liquidated damages provisions in the operative collective bargaining agreements constitute a penalty under federal common law. See Idaho Plumbers, 875 F.2d at 217-18.
 
 
 65
 We now turn to Michigan Carpenters' final contention. The Fund argues that the 20% figure referred to in section 1132(g)(2)(C)(ii) should be assessed on a per annum basis. In essence, Michigan Carpenters is asking the court to allow recovery of liquidated damages of up to 20% annually. Nothing in section 1132(g)(2)(C)(ii) or its legislative history, however, suggest that liquidated damages should be assessed on a per annum basis. See Bennett, 591 F.Supp. at 607. We therefore decline to adopt such an interpretation in the absence of explicit language authorizing it.
 
 
 66
 For all the foregoing reasons, the judgment of the district court is affirmed as to the issues raised in the appeal. As for the issues raised in the cross-appeal, the district court's conclusions regarding defendant Leoni are affirmed. On the liquidated damages issue, we VACATE and REMAND the district court's judgment and order and direct that it make findings of fact as to damages in accordance with our holdings on the liquidated damages issue. The district court's findings are to be limited to Michigan Carpenters.
 
 
 
 [1]
 William H. Leoni Sr. is the son-in-law of Charles J. Rogers
 
 
 [2]
 The original notice of cross-appeal erroneously stated that "Defendant CHARLES J. ROGERS CONSTRUCTION COMPANY, INC., et al [sic]," was the party cross-appealing to this court. The record reveals the counsel for plaintiffs corrected that error on April 3, 1989, within the jurisdictional time limits. See Fed.R.App.P. 4(a)(3)
 
 
 [3]
 The MPPAA protects multiemployer plans by requiring withdrawing employers to pay the multiemployer fund a proportional share of the fund's "unfunded vested liability," 29 U.S.C. Sec. 1381. The fund's trustees have initial responsibility of determining all employee's allocable share of the unfunded vested benefit liability and to collect the amounts due. 29 U.S.C. Sec. 1382
 
 
 [4]
 29 U.S.C. Sec. 1144(b)(2)(B), the "deemer" clause, is not relevant to the instant appeal
 
 
 [5]
 The Michigan Uniform Securities Act replaced the 40-year old Michigan Blue Sky Law, 1933 PA 205. The Michigan Act substantially tracks the language of the Uniform Securities Act. People v. Dempster, 396 Mich. 700, 704, 242 N.W.2d 381 (1976)
 
 
 [6]
 In Weinberger Homes, supra, the court provided a nonexhaustive list of specific factors including undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities and finally, whether the corporation is a sham. 872 F.2d at 704-05 (citation omitted). See also N.L.R.B. v. Fullerton Transfer & Storage Ltd., 910 F.2d 331, 380 n. 13 (1990)
 
 
 [7]
 In the complaint, the plaintiffs sought separate relief under ERISA and the various collective bargaining agreements
 
 
 [8]
 At trial, the plaintiffs presented evidence that delinquent contributions were assessed on either late payment liquidated damages or audit assessments, but not both. Thus, there would be no "double recovery" of liquidated damages on a delinquent contribution