## TRUSTEES OF THE DETROIT CARPENTERS FRINGE BENEFIT FUNDS, Plaintiffs,

v.

## Michael A. NORDSTROM, an individual, d/b/a Eagle Construction Service, Inc., jointly and severally, Defendants.

### No. 10–cv–14160.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 27, 2012.

---

Walter B. Fisher, Fildew Hinks, Royal Oak, MI, for Plaintiffs.

Kyle R. Riem, Grand Blanc, MI, for Defendants.

*OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

GERALD E. ROSEN, Chief Judge.

## I. *INTRODUCTION*

This ERISA contribution action is presently before the Court on the parties' cross-motions for summary judgment. The parties have stipulated to the pertinent facts and exhibits and response briefs have been filed. Having reviewed and considered the parties' motions and responses and the entire record of this matter, the Court has concluded that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Michael A. Nordstrom was the sole owner and officer of the now defunct Eagle Construction Services, Inc. ("Eagle"). While the company was still operating, Nordstrom made the day-to-day decisions relating to which bills and creditors were to be paid and when they were paid.

From April through August 2010, Eagle was engaged by Donald Borg Construction Co., Inc. ("Borg") to perform construction work on two "Forever 21" stores in Southeast Michigan—one in Novi and the second at the Great Lakes Crossing mall in Auburn Hills. These two jobs were the only jobs Eagle was engaged in from February 2010 until Eagle ceased all operations in August 2010. Eagle received $467,481.00 from Borg for work on these two construction projects and all of the funds received were deposited in Eagle's checking account.

Eagle used the monies it received from Borg for the work performed on the Forever 21 projects for the payment of labor, payroll taxes, union dues, materials, bonds, equipment rental, workers compensation insurance, general liability insurance, taxes, professional fees, rent and utilities. However, Eagle did not make any fringe benefit contributions on behalf of employees covered by the Agreement entered into by the Michigan Council of Carpenters (the "Union") and Signatory Independent Contractors (the "CBA") for the months of May and June 2010.

At the conclusion of the Borg projects, there was a balance of $19,733.43 in Eagle's checking account.

The Detroit Carpenter Fringe Benefit Funds subsequently audited Eagle's books and records for the period October 1, 2007 through December 31, 2010. The audit revealed unpaid fringe benefit contributions totaling $87,861.71. Nordstrom agrees that Eagle was bound by the CBA and that all of the individuals listed in the audit performed work covered by the CBA. He does not contest the accuracy of the audit.

The Plaintiff Funds now seek entry of summary judgment in its favor for the total amount of contributions owed by Eagle, plus interest, liquidated damages, attorneys' fees and costs—an amount totaling $161,368,38. Further, inasmuch as Eagle has been dissolved, the Funds also seek an order holding Nordstrom personally liable for this amount because of his breach of his fiduciary duties under ERISA and the Michigan Builder's Trust Fund Act, M.C.L. § 570.151 et seq.

Defendants·do not contest Eagle's liability for the amounts due as reflected in the audit. However, Defendant Nordstrom argues that he cannot be held personally liable for the delinquent contributions because he claims he is not a fiduciary under ERISA. He further claims that he cannot be held personally liable under the Michigan Builder's Trust Fund Act, either, because he used the Borg project funds solely for construction expenses. Accordingly, he seeks a summary judgment finding no personal liability on his part for the Eagle indebtedness.

### III. DISCUSSION

### A. APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must

be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir.2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed.R.Civ.P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the foregoing standards in deciding the parties' cross-motions for summary judgment in this case.

### B. *AMOUNT OWED TO THE PLAINTIFF FUNDS*

■ As indicated, Defendants do not dispute that no contributions were made to the Plaintiff Funds in May or June 2010 and do not contest the accuracy of the Funds' audit of Eagle books and records which revealed unpaid fringe benefit contributions totaling $87,861.71.

Section 502 of ERISA, 29 U.S.C. § 1132(g)(2), provides:

In any action under this subchapter by a fiduciary, for or on behalf of a plan, to enforce section 1145 of this title[1] in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions.

(B) interest on the unpaid contributions.

(C) an amount equal to the greater of—

(i) unpaid contributions

or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A).

(D) reasonable attorneys' fees and costs of the action to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26 [Internal Revenue Code section 6621].

The Sixth Circuit has held that the language of Section 1132(g)(2) is mandatory upon a judgment in favor of the plan. *Michigan Carpenters Council Health and Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 388 (6th Cir.1991).

As indicated the uncontested amount of unpaid contributions owed to the Plaintiff

---

**1.** 29 U.S.C. § 1145 states:

Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collective bargaining agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

Funds is $87,861.71. § 1132(g)(2) provides that at the time a judgment in favor of a plan is entered, the court shall also award interest on the unpaid contributions, an amount equal to the greater of interest on unpaid contributions or liquidated damages provided for in the plan not to exceed 20%, of the amount of unpaid contributions plus attorneys' fees and costs.

The current liquidated damages schedule as established by the Trustees of the Funds, states: "The Employer shall pay liquidated damages equal to .055% of the outstanding delinquent amount for each day it is late, up to a total of 20% of such delinquency." *See* Second Amendment to the Detroit Carpenters Fringe Benefit Funds Delinquent Employer Collection Policies and Procedures, Stipulated Ex. C. The fringe benefit contributions have been delinquent since July 1, 2010. There are 809 days between July 1, 2010 and September 24, 2012. $87,861.71 × .00055 × 809 equals $39,094.06. This is more than 20% of $87,861.71. Therefore, the liquidated damages are capped at 20% of the outstanding delinquency, i.e., $17,572.34.

Courts in this district have also held that a fringe benefit fund is entitled to prejudgment interest on the unpaid contributions at the rate set by the collective bargaining agreement or, if none, the adjusted prime rate set forth in 26 U.S.C. § 6621. *See e.g., Laborers' Pension Trust Fund–Detroit v. Family Cement Co.,* 677 F.Supp. 896 (E.D.Mich.1987) (citing *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982)). In this case, the CBA incorporates by reference, the Detroit Carpenters Fringe Benefit Funds Delinquent Employer Collection Policies and Procedures (the "Collection Policy"). *See* CBA, Stipulated Ex. A, § 10.15. The Collection Policy sets forth a prejudgment interest rate of .049% of the outstanding delinquent amount for each day of the delinquency.

*See* Stipulated Ex. C. $87,861.71 × .00049 × 809 totals $34,829.25.

The Funds also have incurred attorneys fees in the amount of $20,294.50 and costs in the amount of $810.58. The amount of fees and costs sought ($21,105.08) is substantiated by the documented affidavit of Walter B. Fisher, Jr. of Fildew Hinks, PLLC. Defendant has not contested the amounts sought and the Court finds that the fees and costs are reasonable based upon the Lodestar approach mandated by the Sixth Circuit in *Building Service Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392 (6th Cir.1995).

In sum, Plaintiffs have established that the total indebtedness owed to the Plaintiff Funds is $161,368.38.

## C. DEFENDANT NORDSTROM IS PERSONALLY LIABLE UNDER ERISA FOR FAILING TO PAY CONTRIBUTIONS TO THE FUNDS

Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1109(a) imposes personal liability on ERISA plan fiduciaries:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties im-

posed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of the assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

29 U.S.C. § 1109(a).

■ Defendant Nordstrom argues that he cannot be held personally liable to the Plaintiff Funds for the delinquent contributions because he is not a fiduciary under ERISA. He predicates this claim on his argument that the unpaid contributions owed to the Plaintiff Funds are not "plan assets." His argument is that he cannot be deemed a fiduciary since for him to be a fiduciary it must be demonstrated that he exercised discretionary control over plan assets, and since the unpaid contributions were not plan assets, Plaintiffs cannot make this showing. Defendants counter that the unpaid contributions became vested plan assets on the date they became due.

Although Defendant Nordstrom concedes that under 29 C.F.R. § 2510.3–102, amounts withheld from an employee's wages for contribution to a fringe benefit plan become plan assets when they are due, he claims this regulation has no application here because he did not "withhold" any sums from the employees' wages. Nordstrom cites no case law in which the courts excused unpaid contributions on this formalistic basis.

Although the Sixth Circuit has not addressed the issue of when unpaid benefit contributions become plan assets, this Court and other judges in this district have repeatedly held that pension and benefit fund contributions are plan assets as soon as they are *due and owing*. *See, e.g., Plumbers Local 98 Defined Benefit Pension Fund v. M & P Master Plumbers of Michigan, Inc.*, 608 F.Supp.2d 873, 876–80 (E.D.Mich.2009) (Rosen, J.); *Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc.*, 352 F.Supp.2d 794, 805 (E.D.Mich.2004) (Zatkoff, J.); *Operating Engineers' Local 324 Fringe Benefit Funds v. Nicolas Equipment, LLC*, 353 F.Supp.2d 851, 854 (E.D.Mich.2004) (Edmunds, J.); *Trustees of Iron Workers Local 25 Pension Fund v. Municipal Indus. Storage, Inc.*, 2011 WL 1515047 at *3 (E.D.Mich.2011) (Borman, J.); *Iron Workers' Local 25 Pension & Ben. Funds v. Steel Enterprises, Inc.*, 2009 WL 3645633, **4–5 (E.D.Mich.2009) (Rosen, J); *cf. Trustees of Mich. Regional Council of Carpenters Employee Benefits Fund v. Accura Concrete Walls, Inc.*, 408 F.Supp.2d 370, 371 (E.D.Mich.2005) (Cohn, J.); *see also United States v. Grizzle*, 933 F.2d 943, 946–48 (11th Cir.1991), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 223 (1991) (money withheld for deposit into vacation fund was a plan asset); *LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2nd Cir.1997) (money withheld from employees' paychecks for deposit into pension fund was a plan asset); *Plumbers Local 98 Defined Benefit Funds v. Controlled Water, Inc.*, 2006 WL 2708544 at *4 (E.D.Mich.2006).[2] These cases universally

---

**2.** Although the Sixth Circuit recently was presented with an opportunity to address the question of whether unpaid contributions are "plan assets" in *Sheet Metal Local 98 Pension Fund v. AirTab, Inc.*, 482 Fed.Appx. 67 (6th Cir.2012) (unpublished decision), it declined to do so, holding instead that the individual defendants in that case could not be held personally liable for non-payment of the contributions because they were not fiduciaries under ERISA. As an unpublished decision, *AirTab* is not binding precedent, and even if it were, the case is factually distinguishable from this case.

treat delinquent payments to ERISA funds as de facto mismanagement of plan assets.

Furthermore, the CBA and Carpenters Pension and Benefit Fund trust agreements, by their terms, set out a clear obligation to make contributions on a monthly basis and to treat these unpaid contributions as inalienable plan assets. Specifically, the CBA states that the employer is to pay contributions to the funds each month for the prior month to the depository designated by the Fund Trustees. *See* CBA, Stipulated Ex. A, § 10.15(a). Separately, the Trust Agreements state that "no benefit payable or to be payable at any time under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, lien or charge" of any kind. (Stipulated Ex. B, Pension Fund Trust Agreement Art. V; *see also* Benefit Funds Trust Agreements, Art. 6) The special duties imposed by ERISA, federal regulations, the CBA and the trust agreements suggest that monies not paid to employees but required by contract to be set aside for contribution to the Funds, are plan assets entrusted to the employer, to be accounted for by him until such time as they are remitted to the Funds.

■ The Court must next examine whether Nordstrom breached his fiduciary duties. Given the foregoing analysis, it is clear that fund assets, in the form of un-paid contributions, were either diverted for other purposes or simply not paid, as a result of Nordstrom's personal, discretionary control and management of these assets.

As indicated above, under ERISA, an employer is a fiduciary with respect to a welfare-benefit fund the extent that "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). 29 U.S.C. § 1109(a) imposes personal liability on fiduciaries as follows:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of the assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

Finally, a fiduciary "must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A).

Nordstrom has stipulated that he was the sole owner and officer of Eagle Con-

---

The *AirTab* court determined that the mere "refusal to pay the funds as required under the CBA does not rise to the level of exercising discretionary control or authority such that fiduciary status attaches." 482 Fed. Appx. at 69. Because the plaintiffs "point[ed] to no other actions of the [individual defendants] other than their refusal to pay funds as constituting a breach of fiduciary duty," the court concluded that the breach of fiduciary claim was merely a restatement of the funds' breach of contract claim against the corpo-rate defendant. *Id.* In so ruling, however, the court suggested that a different ruling would result if the court were presented with different facts:

> This is not a situation where employers decided to funnel monies from a general account toward paying off company creditors instead of to beneficiaries as in *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir.1997). *AirTab*, 482 Fed.Appx. at 70. It is precisely this *LoPresti*-type of situation that is presented in this case. See discussion, *infra*.

struction Services, Inc. [Stipulated Fact No. 1.] He further has stipulated that he made all of the day-to-day decisions relating to which creditors of Eagle were paid and when they were paid. [Stipulated Fact No. 2.] Nordstrom further stipulated that Eagle failed to pay any of the accrued benefit contributions it owed to the Funds for the Months of May and June 2010 for employees who performed work covered by the CBA. [Stipulated Facts 8, 9]. Nordstrom's own accounting during this time period shows that Eagle Construction had only one bank account; that all of the companies receivables were deposited into that account and all payables were paid from it; that he was the sole signatory on the account; and that he elected to pay Eagle's general creditors instead of making contributions to the plaintiff funds. *See* Nordstrom Dep., Stipulated Ex. E, pp. 14–15; Plaintiffs' Response Brief, Ex. A.

Courts routinely hold that this type of control demonstrates that the officer-defendant is an ERISA fiduciary and can be held personally liable for ERISA contributions. *See e.g., Plumbers Local 98 Defined Benefit Pension Fund v. M & P Master Plumbers of Michigan, Inc.,* 608 F.Supp.2d at 880 ("[Defendant Panknin] also admitted that he had the final say in all decisions regarding M & P, including whether fringe benefit contributions were to be paid."); *Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc.,* 352 F.Supp.2d at 806 ("[G]iven Defendant McGuire's admission that he was responsible for the day-to-day operation of Defendant McGuire Steel, including the decision of whether or not to pay ERISA benefit contributions, no reasonable jury could find that he did not act in a fiduciary capacity."); *Trustees of the Iron Workers Local No. 25 Pension Fund v. Municipal & Industrial Storage, Inc.,* 2011 WL 1515047 at *83–84 ("[I]t is clear that Lettinga exercised control over Municipal and

therefore had discretion over the unpaid contributions. [Lettinga] admitted that he runs the day-to-day operations of the company. Accordingly, he decides what bills to pay, including whether or not to make the fringe benefit contributions required under the CBA.") *See also United States v. Panepinto,* 818 F.Supp. 48, 52 (E.D.N.Y. 1993) (holding that defendants' failure to make required contributions constituted exercise of control over the disposition of employee welfare benefit plan assets under ERISA).

As in the above cases, from the moment Nordstrom knowingly failed to make required contributions to the Funds for his workers, he exercised control respecting disposition of plan assets, held those funds as a fiduciary, and under 29 U.S.C. § 1104(a)(1), was required to discharge his duty "solely in the interest of the participants and beneficiaries of the Funds." 29 U.S.C. § 1104(a)(1)(A). For all of the foregoing reasons, the Court concludes that Defendant Nordstrom is personally liable for the unpaid contributions due and owing to the Plaintiff Funds.

D.  *NORDSTROM ALSO VIOLATED HIS FIDUCIARY OBLIGATIONS PURSUANT TO THE MICHIGAN BUILDER TRUST FUND ACT*

The Michigan Builder Trust Fund Act ("MBTFA") provides:

Sec. 1.  In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

Sec. 2. Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court.

Sec. 3. The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

M.C.L. §§ 570.151–153.

■ The MBTFA is a penal statute that does not expressly provide a civil cause of action. However, the Michigan Supreme Court has recognized a civil cause of action for violation of the provisions of the Act. *See B.F. Farnell Co. v. Monahan,* 377 Mich. 552, 555, 141 N.W.2d 58 (1966); *In re Certified Question,* 411 Mich. 727, 732, 311 N.W.2d 731 (1981); *Nat'l Bank of Detroit v. Eames & Brown,* 396 Mich. 611, 620–621, 242 N.W.2d 412 (1976); *see also DiPonio Contr. Co., Inc. v. Rosati Masonry Co., Inc.,* 246 Mich.App. 43, 631 N.W.2d 59 (2001). In *B.F. Farnell,* the Court cited the longstanding principle that "[w]hen a statute provides a beneficial right but no civil remedy for its securance, the common law on its own hook provides a remedy, thus fulfilling law's pledge of no wrong without a remedy." The Court therefore recognized a "common-law remedy" in favor of those aggrieved by a contractor or subcontractor's violation of the MBTFA. 377 Mich. at 557, 141 N.W.2d 58.

As the Michigan Court of Appeals explained in *DiPonio,* the MBTFA was designed to provide protection to subcontractors and materialmen:

> The builders' trust fund act was originally passed in 1931 as a depression-era measure to afford additional protection to subcontractors and materialmen. During that era, builders often undertook construction projects that were larger than their ability to finance. Therefore, builders often paid suppliers and materialmen on older projects with the funds received on more current operations. When difficult economic times arrived, the builders became insolvent and many subcontractors and materialmen were never paid. In light of this history, it is clear that the design of the act is to prevent contractors from juggling funds between unrelated projects.

*DiPonio Constr. Co., supra,* 246 Mich.App. at 49, 631 N.W.2d 59 (citations and internal punctuation omitted).

■ Because the MBTFA is remedial in nature, it should be construed liberally for the advancement of the remedy. *Id.* (citing *Weathervane Window, Inc. v. White Lake Constr. Co.,* 192 Mich.App. 316, 325, 480 N.W.2d 337 (1991)).

■ To make out a claim for violation of the MBTFA, the plaintiff must show

(1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or

materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project. *Id.*, 246 Mich.App. at 49, 631 N.W.2d 59 (citing M.C.L. § 570.151 *et seq.*)

An officer of a corporation can be held civilly liable under the MBTFA. *See People v. Brown*, 239 Mich.App. 735, 738–41, 610 N.W.2d 234 (2000); *In re Patel* 565 F.3d 963 (6th Cir.2009). The corporate officer who manages the day-to-day business of the corporate contractor stands in a fiduciary relationship to the beneficiaries of the trust. *Id.* As the *Patel* court explained, "[t]he fiduciary relationship established by the [MBTFA] arises at the time any monies are paid to the contractor or subcontractor whether or not there are any beneficiaries of the trust at that time and continues until all the trust beneficiaries have been paid." (quoting *In re Johnson*, 691 F.2d 249, 253 (6th Cir.1982)). Once a statutory trust is activated by payment into a building contract fund, the statute prohibits the contractor's use of monies received for a particular project for anything other that first paying laborers and suppliers on that project. *Id.*

Here, Eagle was a contractor engaged in the building construction industry. [Stipulated Fact No. 10]. Eagle entered into two construction contracts in 2010 with Donald Borg Construction Co, Inc., ("Borg") to remodel two Forever 21 Stores, one in Novi, and the second at Great Lakes Crossing in Auburn Hills. These two jobs were the only jobs Eagle was engaged in From February 2010 until Eagle ceased all operations in August 2010. [Stipulated Fact No. 14]. Borg paid Eagle for all labor and materials provided on the Forever 21 store projects in Michigan. [Stipulated Fact No. 11]. Eagle used the funds it received from Borg to make payments to Eagle's general creditors prior to payment to the builders' trust fund beneficiaries. Nordstrom's accounting of how he spent the trust fund money shows that he used the money for payment of general creditors such as equipment rental, MIOSHA fee, fuel, workers compensation insurance, general liability insurance, and for "overhead" expenses, including clerical wages, taxes (other than payroll taxes), professional fees, rent and utilities. *See* Plaintiffs' Response Brief, Ex. A. In addition to the general creditors listed in Exhibit A are payments to Nordstrom's wife, Sandra Nordstrom ($9,317.00), Nordstrom's son, Jeff Nordstrom ($7,431.47), a Note for a personal loan payable to Ben Patsey ($14,000.00), a Note Payable to Chase Bank ($24,988.23), various payments to Nordstrom's attorney, Kyle Riem, and car payments. *See* Plaintiffs' Response Ex. B. *See also* Nordstrom Dep. pp. 23–25. Nordstrom admitted in his deposition that he and his family are now using the company vehicles, that they did not make any payment to the company for the vehicles, and the company made all of the payments on the vehicles prior to the company going out of business. *See* Nordstrom Dep., pp. 6–9; 24–25. He further testified that Notes were paid in July and August 2010, i.e., shortly before Eagle went out of business. *See id.*, pp. 22–25. Nordstrom also is holding a balance of $19,733.43 in the Eagle account which has not been paid over to trust fund beneficiaries to date, despite demands that the money be paid to the Plaintiff Funds. *See* Ex. C. p. 6; *see also* Stipulated Fact No. 16.

As set forth above, as the sole owner and officer of Eagle, Nordstrom made the day-to-day decisions relating to which

creditors of Eagle were paid and when they were paid. Stipulated Fact No. 2. Nordstrom's payment of general expenses—not job specific expenses—before the payment of Michigan Builder Trust Fund Act claimants is a violation of the MBTFA and a basis for personal liability against Nordstrom.

## CONCLUSION

For all of the foregoing reasons, the Court finds that Michael A. Nordstrom violated his fiduciary duties under ERISA and the Michigan Builders Trust Fund Act. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is GRANTED and Defendant Nordstrom's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Judgment be entered in favor of the Plaintiff Funds and against Defendant Michael A. Nordstrom, individually and d/b/a/ Eagle Construction Service, Inc., in the amount of $161,368.38.