**KIRKLAND DISTRIBUTING COMPANY OF COLUMBIA, SOUTH CAROLINA,** Appellant and Cross-Appellee,

v.

**UNITED STATES of America,** Appellee and Cross-Appellant.

No. 8024.

United States Court of Appeals Fourth Circuit.

Argued Jan. 21, 1960.

Decided March 14, 1960.

George E. Lewis, Asst. U. S. Atty., Columbia, S. C. (N. Welch Morrisette, Jr., U. S. Atty., Columbia, S. C., on brief), for appellee and cross-appellant.

Frank K. Sloan and Jack F. McGuinn, Columbia, S. C. for appellant and cross-appellee.

Before SOPER and BOREMAN, Circuit Judges, and PAUL, District Judge.

PAUL, District Judge.

The subject matter of this litigation is a contract between the Commodity Credit Corporation, an agency of the United States, and Kirkland Distributing Company, a South Carolina Corporation. It was initiated by an action brought by the United States in the District Court seeking to recover from Kirkland Distributing Company the sum of $27,907.-51. On March 23, 1959, the court entered an order giving judgment in favor of the United States for the full amount sued for. Thereafter, upon a petition for rehearing filed by the defendant the judgment of March 23, 1959, was vacated and on July 20, 1959, judgment was entered in favor of the plaintiff in the lesser amount of $12,939.75. From this latter judgment both parties have appealed. In the discussion hereinafter the parties, as a matter of convenience and brevity, will be referred to as CCC and Kirkland, or as plaintiff and defendant respectively.

In April, 1954, the Commodity Credit Corporation, having on hand large quantities of nonfat dry milk solids, offered it for sale at a price of 3.5 cents per pound to be used as an ingredient of animal and poultry mixed feeds. The offer was made in the form of a circular or publication referred to as Announcement LD-6, which was distributed among producers of such feeds. This Announcement LD-6 set out in great detail the conditions under which the milk was to be sold and to be used by those who might purchase it. While LD-6 is too lengthy to be quoted in full herein, certain provisions pertinent to this case must be noted.

Among other conditions embodied in the offer of sale (Announcement LD–6) were the following:

"1. General. In submitting an order to purchase, the terms and conditions of this Announcement LD–6 shall become a part of the order to purchase and upon acceptance by CCC the order and acceptance shall constitute a valid and binding contract. * * * "

Another provision was that "All orders to purchase milk and all confirmations of telephone orders must state: a. That the order is made subject to the terms of this Announcement LD–6."

Another provision (par. 3) was to the effect that the milk sold by CCC would be U. S. Standard Grade or better. And that while CCC did not warrant the fitness of the milk for any particular use, nevertheless the purchaser might, within 10 days after delivery, reject any of the milk for failure to meet the quality specifications.

Paragraph 5 provided in part, and so far as is pertinent, as follows:

"5. Use Warranty: In submitting an order subject to the terms of this announcement, the purchaser warrants that the milk purchased as a result of the order will not be sold except in the form of animal or poultry mixed feeds which must be mixed before November 1, 1954. The purchaser further warrants that such mixed feeds will contain at least five per cent each of three commonly used feed ingredients other than dairy products, will contain not more than 7.5 per cent of milk purchased under this announcement, and will be mixed in the Continental United States. * * *."

Paragraph 6, entitled Proof of Use, provided that:

"On or before November 30, 1954, the purchaser shall forward to the CSS Commodity Office from which he purchased the milk a certificate in a form acceptable to CCC in which

he: (Specimen copy of such form was attached)

"a. Certifies as to the quantity of milk he has purchased through such office under this announcement.

"b. Certifies as to the quantity of such milk he has mixed as a component of animal or poultry mixed feed in accordance with the Use Warranty provided in paragraph 5 above."

Paragraph 7, here quoted in full, is as follows:

"7. Price Adjustment: Disposition of the nonfat dry milk solids for the restricted use contemplated by this announcement has been authorized as a part of the program to support prices to producers of milk and butterfat. The sales prices for such uses are below the CCC published domestic sales price for unrestricted use of such milk and are in consideration of the restricted use to which the milk will be put and are contingent upon the milk being so used within the period provided herein. Regardless of the grade or quality of the milk delivered by CCC, the sales price for the milk delivered and not used in accordance herewith will be adjusted by adding to the sales price for restricted use a sum equal to the difference between such sales price and the CCC domestic sales price for unrestricted use for U. S. Extra Grade spray process nonfat dry milk solids current on the date of delivery by CCC for the State in which delivery is made, and the purchaser will promptly pay to CCC upon demand the balance due on the adjusted purchase price. With respect to any milk not put to the restricted use, as warranted in accordance with paragraph 5, prior to November 1, 1954, as evidenced by the certificate required by paragraph 6,

or otherwise, and with respect to any milk with respect to which the purchaser fails to supply the certificate as required, it is agreed that it shall be conclusively presumed that such milk has been used or is to be used for other than the permitted restricted use and the purchase price shall be adjusted accordingly. Notwithstanding the conclusive presumption CCC may, in its absolute discretion, for good cause shown, grant an extension of time for the filing of the certificate as provided in paragraph 6."

On four different dates during the month of August, 1954, Kirkland placed orders for milk, each of which orders stated that it was subject to the provisions of Announcement LD–6. The milk shipped under these orders aggregated 205,789 pounds and was received by Kirkland during August, September and October. Kirkland paid for the milk comprised in these four orders the amount of $7,076.62.

On October 12, 1954, CCC issued a notice to all purchasers of milk under Announcement LD–6 calling attention to the necessity of filing "Proof of Use" as required by Paragraph 6 of the Announcement and enclosing a form for such certificate. The notice of October 12th further stated that purchasers of milk under Announcement LD–6 were permitted to sell it to other persons for use in animal and poultry mixed feed before November 1, 1954; provided, that CCC be furnished with a Use Warranty and Proof of Use Certificate and provided further that sales to such other purchasers be at a price not in excess of that paid to CCC for the milk and that CCC be advised of all such sales with the names and addresses of all such third-party purchasers.[1]

The evidence is clear that almost at once after receiving the first shipment of milk Kirkland proceeded in flagrant dis-

---

1. Note: It is stated by counsel that CCC also extended until November 30 the time within which the milk was required to be mixed into the feed. We are unable to find support for this in the record, but whether or not such extension was granted is immaterial to the issues in the case.

regard of the agreement under which he had purchased and in violation of its most important provisions. Of the milk purchased he used approximately 100,000 pounds as an ingredient of mixed feeds prepared by himself. In doing so he used approximately 400 pounds of milk to one ton of feed, thus making the milk content about 20 per cent of the mixed feed as against the limit of 7.5 per cent fixed by the Announcement LD–6, and thereby displacing other commonly used ingredients contrary to the terms of the agreement.

As early as the latter part of August, shortly after receiving the first shipment of milk, Kirkland began selling some of the milk to other persons. This was long before permission to make such sales was granted by the notice of October 12. These sales to third persons continued throughout September, October and into November. The sales by Kirkland to other persons aggregated 105,975 pounds and were at prices ranging from 6.5 cents to 7.5 cents a pound. Kirkland received more for the milk he sold than he had paid for the entire 205,000 pounds purchased by him.

It is not clear how much of the milk sold by Kirkland to others was for mixing in feeds. It appears, however, that 61,600 pounds of it was sold to a concern known as Dreher Packing Company for use in the preparation of sausage for human consumption and that Kirkland offered it for sale for this particular use. Kirkland also sold 4200 pounds of the milk to Edens Food Stores for use in a bakery conducted by that concern and which presumably became an ingredient of the bakery products. Some sales were made which were not disclosed by any records kept by Kirkland.

Kirkland never made any report to CCC of the sales made by him to other persons as directed by the notice of October 12, 1954. In fact he never made any report to CCC of his disposition of any part of the milk he received, whether used in his own business or sold to others. He ignored entirely the provision of paragraph 6 of the contract requiring the filing of a Proof of Use and continued to do so even though the notice of October 12 again reminded all purchasers of this requirement and of the date for its fulfillment. The record shows that as late as March 11, 1955, CCC was still trying to procure from Kirkland Certificates of Use as to the milk purchased by him, as shown by a letter of that date reminding him that no such certificates had been filed and enclosing certificate forms for each of his four contracts.

After Kirkland continued in his failure to file any Certificate of Use, CCC in May 1955, sent one of its agents to make an investigation as to the disposition of the milk purchased by him. It was this investigation which resulted in disclosing the facts which have been hereinbefore recited as to the manner in which the milk had been disposed of.

Following disclosure of the various particulars in which Kirkland had violated the contract CCC invoked that provision (paragraph 7) of the agreement entitled Price Adjustment. This part of the contract provided that if any of the milk purchased was not used in accordance with the terms of Announcement LD–6, then as to such milk the purchase price would be increased by an amount representing "the difference between the amount paid (3.5 cents) and the CCC domestic sales price for unrestricted use for U. S. Extra Grade spray process nonfat dry milk solids current on the date of delivery by CCC for the State in which delivery is made." The current price of U. S. Extra Grade spray process nonfat dry milk solids in South Carolina on the dates of delivery of the milk was 17 cents per pound, and it was so stipulated in the District Court.

Following ineffectual demand on Kirkland for payment at the adjusted price CCC instituted suit against him for $27,-907.51, this being the difference between the cost of the milk at 17 cents and the amount he had paid at 3.5 cents.

The case was tried before the Court without a jury and on March 23, 1959, the District Judge handed down his findings of facts and conclusions of law and

entered judgment against Kirkland for $27,907.51, the full amount sued for. The defendant thereupon filed a motion praying the Court to vacate its order of March 23rd and to enter judgment for the defendant. After considering this motion the Court, on July 20, 1959, filed amended findings and entered an order vacating the judgment previously entered and giving judgment against Kirkland in the reduced amount of $12,939.75. From this order both parties have appealed, Kirkland insisting that the judgment should have been entered in his favor; the United States on the ground that it is entitled to recover the amount first adjudged, $27,907.51.

In his amended findings the District Judge did not set forth specifically his reasons for reducing the judgment but the amended findings include the following:

"12. The sales to Edens Food stores, Christian T. Wolfe, and Dreher Packing Company, in the respective amounts of 4,300 pounds, 30,050 pounds, and 61,600 were in violation of the terms of the contract, in that it was sold for human consumption or other consumption forbidden by the terms of the contract."

(Note: the sales to Eden Food Stores amounted to 4200 pounds. The recital of 4300 is apparently a typographical error.)

These sales aggregated 95,850 pounds and application of the adjusted price to them results in the amount of the second judgment. It would appear, therefore, that the District Court concluded that the adjusted price should be applied only to such milk as was sold by Kirkland to others and used by the latter for purposes other than as an ingredient of feed.

With this conclusion we are unable to agree. All of the milk which came into Kirkland's hands was used or disposed of by him in violation of his contract. Not a pound of it was disposed of in compliance with his agreement. The restrictions on the disposition of the milk were not limited to denial of its use for human consumption. They included, as equally binding, agreements that it should be mixed in feeds only in limited proportions and not to the displacement of other essential feed ingredients; that if sold to others it should be at a price no greater than had been paid for it. Kirkland violated every one of these undertakings and no reason appears why if the adjusted price is applicable to any part of the milk it is not applicable to all of it. All of the restrictions imposed by CCC upon the use or disposition of this milk were based on sound purposes and were obviously in the public interest. The disregard of any of them was as harmful as that of any other.

■ It may be noted that on this appeal Kirkland does not attempt to support the distinction which the trial court drew between milk used by him and that which he sold. On the contrary he insists that the United States is entitled to recover nothing, and he offers several defenses to the action. The first of these, which is plainly without merit, is that the contract was rendered inoperative because it was unilaterally amended by CCC. The only amendment made to the provisions of Announcement LD-6 after Kirkland placed his orders in August was, the notice of October 12th which granted to purchasers from CCC the right to sell to others. This was an advantage granted to purchasers to which, of course, Kirkland did not object and of which he made use. To claim that this favor granted by CCC relieves him of all liability is so unreasonable as to need no further discussion. Reference is made by counsel to other amendments to the original Announcement LD-6. All of these, which were trivial, were made long prior to August, 1954. They were known to Kirkland and were a part of LD-6 when he entered his orders of purchase in August.

■■ A further defense offered is to the effect that those provisions of paragraph 5 of Announcement LD-6, Use Warranty, were invalid as being a restraint upon the use and alienation of personal property. We find no merit in this contention. It is not the law that the

seller of property cannot, under any circumstances, impose restrictions upon its use by the buyer. On the contrary such restrictions are consistently upheld when shown to be reasonable. Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L.Ed. 315; Smith v. San Francisco & N. P. R. Co., 115 Cal. 584, 47 P. 582, 35 L.R.A. 309; Chicago Sugar Co. v. American Sugar Refining Co., 7 Cir., 176 F. 2d 1; Tri-Continental Financial Corp. v. Tropical M. Enterprises, 5 Cir., 265 F.2d 619; 36 Am.Jur. 586. Not only do we consider that the restrictions imposed here were reasonable but that they were essential to the protection of the public interest. It was in the interest of the public welfare that this milk, sold at little more than a nominal price, should not compete with or destroy the market for similar milk which commercial producers were selling in the ordinary channels of trade for human consumption.

In this connection the language of the Court in United States v. Weisbrod, 7 Cir., 202 F.2d 629, 633, seems appropriate, as contained in the following excerpt:

> "In disposing of Surplus Property the Government is not engaged in normal trade. In disposing of property, it may attach such reasonable conditions as are necessary for the general welfare. If one does not wish to bid for Government Surplus Property with the conditions attached, his alternative is to make no bid."

We have no question of the authority of the Commodity Credit Corporation to make these sales. The Act creating the Corporation, 62 Stat. 1070, 15 U.S.C.A. § 714, enumerates among its general powers (15 U.S.C.A. § 714b) the right to adopt and amend "rules and regulations governing the manner in which its business may be conducted and the powers vested in it may be exercised." Among its specific powers (15 U.S.C.A. § 714c) is the right to "(d) Remove and dispose of or aid in the removal or disposition of surplus agricultural commodities."

By further legislation, 7 U.S.C.A. § 1427, 63 Stat. 1055, CCC is authorized to sell any farm commodity owned or controlled by it and is freed from any restriction as to the price of sale where the commodity sold is for seed or feed purposes and where such sales will not impair the price-support program.

■■ Finally it is urged by Kirkland that the adjusted price provisions of the contract (paragraph 7) are invalid as constituting a penalty which the courts should not enforce. We are unable to accept this view. It is true, as urged by counsel, that whether a provision of a contract is to be held to provide for a penalty or for liquidated damages is not to be determined by the name given it. Inquiry is to be had into the real purpose and nature of the provision. United States v. Bethlehem Steel Co., 205 U.S. 105, 120, 27 S.Ct. 450, 51 L.Ed. 731; United States v. LeRoy Dyal Co., 3 Cir., 186 F.2d 460, 461. But when we come to examine this part of the contract here in the light of its purpose, we think it clear that its provisions are legal and enforceable and are not in any manner in the nature of those penalties the enforcement of which is frowned upon.

There was a time when the courts were inclined to hold that any provision of a contract fixing payments for its breach, other than those proven as actual damages, constituted unenforceable penalties. But this rigid view no longer obtains. In United States v. Bethlehem Steel Co., 1907, supra, this was noted in the following language [205 U.S. 120, 27 S.Ct. 455]:

> "The Courts at one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be recovered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own

contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained."

█ A provision in a contract calling for a sum to be paid upon its breach may well be called a penalty, and as such not be enforced, where it is for an arbitrary amount irrespective of the damage sustained and showing no relation to actual damage done and which has no reasonable basis in the purposes or subject matter of the contract. On the other hand when the payment called for arises out of the nature of the contract and is designed as a fair measure of the harm done by its breach, it is not to be treated as a penalty and is enforceable.

In United States v. Bethlehem Steel Company, hereinbefore cited, the contract called for the payment by the manufacturer of $35.00 per day for each day's delay in the delivery of certain gun carriages purchased by the Government. The parties, in their contract, designated this payment as a "penalty" for delay. The Supreme Court, after stating that the name used by the parties was not controlling, held that the provision was in effect one for "liquidated damages", although the latter term nowhere appeared in the contract. In reaching this conclusion the Court pointed out that the subject matter of the contract was such that the amount named as a "penalty" was not an arbitrary amount but was a reasonable measure of the disadvantage to the Government through delayed delivery. The Court further said that its conclusion that the payments imposed should be regarded as liquidated damages "is also strengthened when we recognize the great difficulty of proving damage in a case like this, regard being had to all the circumstances heretofore referred to." It was further noted that although the emergency for which the gun carriages were ordered had terminated before their delivery, and that "practically no damage accrued to the government" because of the delayed delivery, these facts did not affect its right to enforce its claim for the damages agreed on.

In United States v. LeRoy Dyal Co., 3 Cir., 186 F.2d 460, 461, the Commodity Credit Corporation had entered into a contract with a dealer in potatoes for the purpose of carrying out the price support program. Under the terms of the contract the dealer (LeRoy Dyal) was permitted to purchase potatoes only from eligible growers, and the contract contained the following clause:

"Article 11. Liquidated Damages. In the event Dealer purchases ineligible potatoes or potatoes of an ineligible grower or pays for potatoes less than the applicable support price or fails to comply with directions of CCC to withhold certain potatoes from market, or sells ineligible potatoes belonging to another person or sells potatoes belonging to an ineligible grower, the parties hereto agree, in view of the difficulty of ascertaining the exact damages suffered by CCC as a result of such actions, that such damages shall be $3.00 per hundredweight or fraction thereof of potatoes so purchased or sold and that Dealer will pay said amount to CCC as compensation and not as a penalty. * * "

The District Court had held that the provisions of the quoted paragraph constituted a penalty which was not enforceable. The Court of Appeals, in reversing, held that it was a reasonable provision for damages which the parties had agreed on and which would have been difficult to prove after breach; and, therefore, so the Court said, "The defendant is liable according to his agreement for breaking a contract voluntarily entered into."

There is considerable similarity between the contact in the case mentioned and that which is before us, particularly in the restrictions placed upon those who contracted with CCC in regard to their dealings with other persons and in regard to their failure to comply with terms imposed by CCC. There is a similarity in

the cases also in the difficulty in measuring with accuracy the monetary damage, if any, done to CCC by breach of the contract. In both cases the damage caused by breach of the contract was primarily to the public. At the same time the contract before us presents a much stronger case than does the one cited for upholding the validity of the adjusted price provision.

In offering this milk for sale the CCC had made it plain, not only in Announcement LD–6 but in other notices accompanying the announcement, that the milk was sold subject to rigid restrictions as to its use. The conditions that the milk should be used only in mixed feeds and then only in limited proportions had obvious purposes. One was to insure that the milk should not find its way into trade channels for human consumption in competition with and to the detriment of those who were producing similar milk for that purpose. It was, therefore, logical to impose the condition that if the milk were used for other than the agreed purposes the purchaser should pay the price currently charged for milk sold by the CCC for unrestricted use. It appears from a notice furnished to buyers along with Announcement LD–6, and introduced in evidence, that the milk offered for sale was part of a stock which the CCC had accumulated at a cost of approximately 16.73 cents per pound. Whether we call the "adjusted price" by that name or call it "liquidated damages" is of no moment. The adjusted price, which turned out to be 17 cents, was a reasonable and accurate measure of the sum to be paid in case use of the milk was not confined to the restricted one agreed on.

We think this conclusion must apply also to that portion of the milk mixed into feed. The condition which limited the amount of milk in the feed mixture was equally as binding as the condition that the milk should be mixed into feed. It was made clear that the limitation on the amount of milk to be used in the feed mixtures was to insure that there was no displacement of proper proportions of other customary ingredients. Kirkland chose also to ignore this condition and mixed the milk in his feeds in unrestricted amounts. What Announcement LD–6 stated and what buyers of the milk agreed to was this: That the milk was sold with certain restrictions upon its use and that the price of 3.5 cents was conditioned on this restricted use. And that if purchasers used or disposed of the milk free of the restrictions imposed they would be compelled to pay the current price for milk sold for unrestricted use. We think this a proper and reasonable provision of the contract and that it applies to all milk, whether used by Kirkland or sold by him to others, which was used free of the restrictions imposed by the contract.

One minor matter perhaps merits comment. Kirkland states that his failure to file the proof of use required by paragraph 6 of Announcement LD–6 was due to the fact that sometime late in the year 1954 he was assured by a representative of CCC that it was not necessary for him to do so. This is specifically denied by the agent mentioned, and would seem to be further denied by the fact that as late as March, 1955, the CCC was writing to Kirkland urging him to file the Certificates of Use. Whatever the fact is it is of no materiality. In presenting its claim CCC has not relied on the presumption of illegal disposition of the milk arising from failure to furnish proof of use, as set out in paragraph 7 of the contract. It has established its right to recover by definite proof that all of the milk was used in a manner violative of the agreement.

The case is remanded to the District Court with directions to vacate the judgment entered July 20, 1959, in the amount of $12,939.75 and to enter judgment in the full amount sued for, namely, $27,-907.51 with interest from January 31, 1955, in accordance with the order of March 23, 1959.

Remanded with directions.