**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2080**

PLUMBERS & PIPEFITTERS LOCAL 625; PLUMBERS & STEAMFITTERS
LOCAL 565; PLUMBERS & STEAMFITTERS LOCAL 83; WEST VIRGINIA
PIPE TRADES HEALTH AND WELFARE FUND,

   Plaintiffs – Appellants,

v.

NITRO CONSTRUCTION SERVICES, INC., f/k/a Nitro Electric Company, Inc.,

   Defendant – Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at
Charleston.  John T. Copenhaver, Senior District Judge.  (2:18-cv-01097)

Argued:  October 28, 2021       Decided:  February 23, 2022

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge
Richardson joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:**  Avrum Levicoff, THE LEVICOFF LAW FIRM, Pittsburgh Pennsylvania, for
Appellants.  R. Booth Goodwin, II, GOODWIN & GOODWIN, LLP, Charleston, West
Virginia, for Appellee.  **ON BRIEF:**  John Dascoli, JOHN DASCOLI, PLLC, Charleston,
West Virginia, for Appellants.  Benjamin B. Ware, Shanna L. Brown, Lucas R. White,
GOODWIN & GOODWIN, LLP, Charleston, West Virginia, for Appellee.

WILKINSON, Circuit Judge:

Plaintiffs, a group of labor unions and the West Virginia Pipe Trades Health and Welfare Fund, sued Nitro Construction for liquidated damages after Nitro made a series of tardy payments to the Fund. The district court granted summary judgment to Nitro, holding that the liquidated damages constituted penalties and were therefore unrecoverable. For the following reasons, we affirm the judgment.

I.

The West Virginia Pipe Trades Health and Welfare Fund is an employee health and welfare fund. It provides benefits for employees who work for participating employers and are members of one of three unions: Plumbers & Pipefitters Local 625, Plumbers & Steamfitters Local 565, and Plumbers & Steamfitters Local 83. Nitro Construction Services, Inc., is a participating employer, and its employees are members of the unions who benefit from the Fund. Under the terms of the collective bargaining agreements with the unions, Nitro was required to make cash contributions to the Fund each month.

The collective bargaining agreement also incorporated the Fund's Trust Agreement, which gives the Trustees authority to adopt a system for collecting contributions. Under that authority, the Trustees adopted a "Delinquent Employer Procedure," in effect through January 25, 2017, and a "Policy for Collection of Delinquent Contributions," effective after that date. Both procedures required participating employers to submit monthly contribution reports and contribution payments on or before the 20th of each month. For late contributions, both imposed liquidated damages of ten percent for the first month of delinquency, plus interest at a rate of one percent per month and attorneys' fees incurred

2

to recover the amounts due. The policies also set forth various steps that the Fund would take to notify the delinquent employer of late or missed payments.

Nitro made late contribution payments to the Fund on several occasions between June 2016 and August 2017. The parties dispute whether the Fund notified Nitro in accordance with its collection procedures. All agree that Nitro paid its contribution in full before any suit was filed. In any event, the Fund and the unions sued Nitro for breach of contract for its tardy payments, seeking $77,373.95 in liquidated damages, plus interest and attorneys' fees, as provided for by the collection procedures. The suit was brought in federal court pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.

After discovery, the parties filed cross-motions for summary judgment. The Fund sought summary judgment on Nitro's contractual liability for liquidated damages and interest for its late contributions plus attorneys' fees.[1] Nitro sought summary judgment on the grounds that the liquidated damages provisions were unenforceable penalties. The district court denied the Fund's motion and granted Nitro's motion in part. As relevant here, it found the liquidated damages provisions unenforceable as a matter of federal common law, which prohibits punitive damages for breach of contract.[2] The Fund appeals

[1] We refer to all plaintiffs collectively as "the Fund" throughout this opinion.

[2] The district court also granted in part Nitro's motion for summary judgment as to attorneys' fees, finding that the Fund was not entitled to attorneys' fees incurred in its unsuccessful effort to collect liquidated damages. The Fund then voluntarily dismissed its claim for interest. Accordingly, the only issue before us on appeal is the district court's grant of summary judgment to Nitro on the claim for liquidated damages.

that determination and argues that this case should be guided, if not governed, by the Employment Retirement Income Security Act (ERISA), which allows punitive liquidated damages, rather than the traditional common law rule.

II.

A.

The Fund brought this suit for breach of contract under § 301 of the LMRA. That section allows "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce" to "be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). The Supreme Court has long held that § 301 "is more than jurisdictional"—it also "authorizes federal courts to fashion a body of federal law for the enforcement of . . . collective bargaining agreements." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–51 (1957). Thus "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." *Id.* at 456; *see also McCormick v. AT&T Techs., Inc.*, 934 F.2d 531, 534 (4th Cir. 1991) (en banc) ("Section 301 not only provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes.").

The federal common law to be applied in § 301 cases is ordinarily the general law of contracts. *See New England Carpenters Cent. Collection Agency v. Labonte Drywall Co.*, 795 F.3d 271, 277 (1st Cir. 2015); *Turner v. Am. Fed'n of Tchrs. Loc. 1565*, 138 F.3d

4

878, 882 (11th Cir. 1998); *Agathos v. Starlite Motel*, 977 F.2d 1500, 1509 (3d Cir. 1992); Caleb Nelson, *The Persistence of General Law*, 106 Colum. L. Rev. 503, 521 (2006) ("[E]ver since the Supreme Court read [§ 301] to federalize the interpretation of collective bargaining agreements, judges have routinely invoked 'general contract principles' to answer questions that the Act does not itself address."). Thus, "we interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law" as long as "those principles are not inconsistent with federal labor policy." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (citing *Lincoln Mills*, 353 U.S. at 456–57). And to determine the general principles of contract law, we often look to the Restatements. *U.S. ex rel. Ubl v. IIF Data Sols.*, 650 F.3d 445, 451 (4th Cir. 2011); *In re Peanut Crop Ins. Litig.*, 524 F.3d 458, 470 (4th Cir. 2008).

The Restatement of Contracts makes clear that "the purpose[] of awarding contract damages is to compensate the injured party." Restatement (Second) of Contracts § 355 cmt. a (1981); *see also Strum v. Exxon Co., U.S.A.*, 15 F.3d 327, 330 (4th Cir. 1994). Accordingly, the common law has "long recognized that compensating the individual only for actual loss will suffice." *Strum*, 15 F.3d at 330 (citing *id.*). Therefore, "[i]t can be laid down as a general rule that punitive damages are not recoverable for breach of contract." 5 Arthur L. Corbin, Corbin on Contracts § 1077, at 438 (1964); *see also Barnes v. Gorman*, 536 U.S. 181, 187, (2002); *Strum*, 15 F.3d at 330.

Liquidated damages which are penal in nature are likewise disfavored. Restatement (Second) of Contracts § 356 ("A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."); *Kirkland Distrib. Co. of*

5

*Columbia, S.C. v. United States*, 276 F.2d 138, 144–45 (4th Cir. 1960). As the district court recognized, we enforce liquidated damages provisions only if actual damages would be difficult to ascertain and the liquidated damages bear some reasonable relationship to the actual harm that was caused. *See* J.A. 458–59; *Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947); *In re Apex Exp. Corp.*, 190 F.3d 624, 638 (4th Cir. 1999) (citing Restatement (Second) of Contracts § 356); *Kirkland*, 276 F.2d at 145.

B.

Applying this test, the district court determined that the liquidated damages provisions here were punitive. It found that the Fund did not show that they "were the result of good-faith efforts to set an amount reflective of the damages it anticipated from late contribution payments." J.A. 473. Therefore, the district court declined to enforce them. Notably, the Fund does not challenge the district court's characterization of the liquidated damages provisions as penalties, and indeed it embraces that description.

Instead, it argues that such penal liquidated damages provisions should be enforceable here despite the general rule against them. It points to § 502(g)(2) of ERISA, which makes explicit provision for liquidated damages up to twenty percent in the case of companies with unpaid obligations to welfare and benefit funds like this one.[3] *See* 29 U.S.C. § 1132(g)(2).

---

[3] Contrary to Nitro's contention, the Fund did not waive this argument on appeal. The Fund raised a version of this argument before the district court, *see, e.g.*, J.A. 391, and the district court rejected it, J.A. 460–64.

We find that position unpersuasive. ERISA § 502(g)(2) by its very terms does not support the Fund's position in this case. That section of ERISA only applies to "*unpaid* contributions." 29 U.S.C. § 1132(g)(2) (emphasis added). All agree that Nitro's contribution payments were tardy, but they were paid in full before this suit was commenced. And § 502(g)(2) does not reach such late—but paid—contributions. We are in accord with other circuits in making this distinction and recognizing that § 502(g)(2) only applies to unpaid contributions. *See, e.g.*, *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 654 (7th Cir. 2001); *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 388 (6th Cir. 1991); *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir. 1989); *Carpenters & Joiners Welfare Fund v. Gittleman Corp.*, 857 F.2d 476, 478 (8th Cir. 1988). And indeed, the Fund concedes that ERISA § 502(g) does not directly apply here.

Nonetheless, the Fund urges us to look to that provision not for what it says, but for what it apparently indicates about Congress's overarching intent. The Fund argues that § 502(g)(2) provides evidence of a federal labor policy generally favoring punitive damages against companies in labor disputes. According to the Fund, Congress's addition of the twenty-percent liquidated damages provision in § 502(g)(2) through the Multiemployer Pension Plan Amendments Act of 1980 (MPPA) demonstrated its intent to incentivize employers to timely pay contributions and penalize them if they fail to do so. This general labor policy, it says, should trump the traditional common law rule in this § 301 dispute. Only the Seventh Circuit has taken such an approach, stating that even where

7

ERISA's penalty provision does not directly apply, it nonetheless "provides guidance to what is a reasonable remedial scheme" in this context. *Operating Eng'rs*, 258 F.3d at 655. The Seventh Circuit based its ruling in part on its view that the common law rule against punitive damages, though "an established principled of the law of contracts," was "antiquated and should not be extended into ERISA-land." *Id.*

We disagree. "Traditional rules of contract construction . . . apply to collective bargaining agreements" unless they "conflict with federal labor law." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1025 (4th Cir. 1997); *see also Tackett*, 574 U.S. at 435. Here there is no conflict: ERISA does not speak to cases of tardy contributions. Congress deliberately chose not to include within § 502(g)(2)'s ambit contributions that were tardy but fully paid. Thus, while Congress displaced the common law rule against punitive damages for cases of unpaid contributions covered by § 502(g)(2), it did not similarly displace the common law rule in cases of tardy contributions. The common-law rule against punitive damages stands.

Nor can ERISA be read to evince an overarching federal policy favoring punitive damages in all labor disputes. Congress was very precise in detailing what ERISA's liquidated damages provision covers and what it does not; it does not establish a general policy. Extrapolating a general congressional intent to allow punitive damages in other cases not covered by § 502(g)(2), as the Fund asks us to do, would disregard the plain language of that provision. For "[t]he 'plain purpose' of legislation . . . is determined in the first instance with reference to the plain language of the statute itself," *Bd. of Governors of*

8

*Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373 (1986), which here allows punitive liquidated damages for unpaid contributions but *not* for tardy ones.

The line between tardy versus unpaid payments is not a trivial or senseless one. Tardiness, while not admirable, may be understandable. Whether because of temporary tough times or sheer inadvertence, a company may be tardy in its payments. *See, e.g.*, J.A. 240 (Nitro asserting that mail delays and "family related medical issues" of an employee responsible for union payments were in part responsible for the tardiness); *Mich. Carpenters Council*, 933 F.2d at 378 (describing the "financial difficulties" of the "small, family-owned and operated corporations" that led to tardy contribution payments). But the statute affords the tardy company every incentive to meet its obligations to the Fund and thus avoid the more severe § 502(g)(2) penalty. To impose a more draconian sanction at the very outset might not only dull that incentive but push struggling companies in the direction of insolvency. The resulting loss of jobs and possible benefits would be to no one's profit.

We are not entitled "to ignore the plain language of the statute in order to effectuate what [the appellants] claim to be the overarching purpose of Congress." *First S. Prod. Credit Ass'n v. Farm Credit Admin.*, 926 F.2d 339, 346 (4th Cir. 1991). To do so would discount "the complexity of the problems Congress is called upon to address and the dynamics of legislative action" and "takes no account of the processes of compromise." *Dimension Fin. Corp.*, 474 U.S. at 373–74 (1986). Consequently, even if Congress did intend to incentivize prompt payments, "we are not at liberty to go farther in serving this

laudable goal than Congress chose to go in enacting the MPPA." *Carpenters & Joiners*, 857 F.2d at 479 n.4.

Our friend in dissent would offer remedies far beyond what Congress provided; impose penalties far beyond any damages caused; and adopt vague standards well beyond the possibility of future ascertainment. Whatever federal labor law policies and "penumbra[s]" the dissent prefers, Dissenting Op. at 18, are simply unclear to us. By contrast, the clarity with which § 502(g) of ERISA applies to this case is a gift, and we decline to join our dissenting colleague in rejecting it.

C.

ERISA thus spares us the need to embark on the dissent's uncharted course. We accordingly join the Sixth, Eighth, and Ninth Circuits in holding that punitive damages are not recoverable in LRMA § 301 cases for late contribution payments. *See Mich. Carpenters*, 933 F.2d at 390; *Carpenters & Joiners*, 857 F.2d at 479; *Idaho Plumbers & Pipefitters*, 875 F.2d at 217–18. The common law's recognition of the unjustness of awarding non-compensatory liquidated damages is underscored in this case. The Fund is seeking almost $80,000 in liquidated damages, even though its actual damages in the form of lost interest are readily ascertainable and were a mere fraction of the liquidated damages the Fund seeks. *See* J.A. 236 (calculating $3,952 in lost interest). And Nitro's late payments did not result in a single claim being denied to any beneficiary. J.A. 429. Moreover, though we might "look with candor, if not favor, upon [nonpunitive liquidated damages] provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights," *Wise v. United States*,

10

249 U.S. 361, 366 (1919), the district court rightly recognized that situation is not present here. J.A. 468. Nitro never agreed to the liquidated damages provisions that the Fund is seeking to enforce; the Fund unilaterally created its delinquent employer procedures, including ten percent liquidated damages, using authority granted by its governing document and incorporated into the contract. In sum, the district court did not err by finding these liquidated damages provisions to be punitive and declining to enforce them.

It is worth noting that the Fund was not without opportunity for redress here. It could have pressed its suit for lost interest, a measure of actual damages for Nitro's late payments. *But see* J.A. 492, 504 (plaintiffs voluntarily withdrawing their claim for interest). Moreover, if the Fund does not like the application of the common law rule here and desires punitive damages for late payments, it may press that case before Congress. For here, "Congress' intent is so plain that policy arguments of this kind must be addressed to the body that has the authority to amend the legislation, rather than one whose authority is limited to interpreting it." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 551 (1988). We are not at liberty to broaden the scope of ERISA's § 502(g)(2) liquidated damages remedy; only Congress may amend the statute it enacted.

## III.

For the foregoing reasons, the judgment is affirmed.[4]

---

[4] The Fund also urges us to find that the notice provisions of its procedures for delinquent contributions are not conditions precedent to collecting liquidated damages (Continued)

11

---

under those procedures. Because we determine that the liquidated damages provisions are unenforceable, we need not reach this issue.

WYNN, Circuit Judge, dissenting:

Federal labor law permits parties to agree under a collective bargaining agreement that liquidated damages may be recovered against an employer that is delinquent in making contributions to multiemployer plans. In this instance, where Nitro was late making its contributions in *at least seventeen instances* over a fifteen-month period before the Fund brought this lawsuit under § 301, the district court's order granting summary judgment in favor of Nitro and against the Fund should be reversed. Accordingly, I respectfully dissent from the contrary view of my good colleagues.

I.

The central issue in this appeal is whether the district court properly formulated the federal common law rule applicable to federal labor policy enforcing remedies for delinquent employee welfare benefit fund contributions.

A.

"The starting point of our inquiry" is § 301 of the Labor Management Relations Act. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 449 (1957). Section 301 allows for "[s]uits for violation[s] of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). The provision "authorizes federal courts to fashion a body of federal law" from "our national labor laws" for "the enforcement of [] collective bargaining agreements." *Lincoln Mills*, 353 U.S. at 451, 456; *see Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962) (holding

13

that "under the mandate of *Lincoln Mills*" federal labor law is "paramount" when deciding issues raised under § 301); *see also McCormick v. AT & T Techs., Inc.*, 934 F.2d 531, 534–35 (4th Cir. 1991) (acknowledging that § 301 directs federal courts to develop federal common law to resolve "disputes covered by collective bargaining agreements" in order to "promot[e] the peaceable, consistent resolution of labor-management disputes" (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 (1988))).

The majority opinion acknowledges the importance of federal labor policy yet begins its analysis of the collective bargaining agreement with general contract-law principles as explicated by the Restatement (Second) of Contracts. Majority Op. at 5. The majority then describes the general rule against punitive damages and analyzes whether liquidated damages are penal. *Id.* at 4–5. The fundamental flaw in this approach is that, by failing to locate federal labor policy centrally in the analysis, the majority flips the proper order of analysis on its head.

Importantly, a collective bargaining agreement "is more than a contract," *McCormick*, 934 F.2d at 536 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960)), involving "substantial organizations rather than mere consumers," *Operating Eng'rs Loc. 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 655 (7th Cir. 2001). As such, the "[t]raditional rules of contract construction . . . apply to collective bargaining agreements *only when they do not conflict with federal labor law.*" *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1025 (4th Cir. 1997) (emphasis added); *see M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (holding the Court interprets

14

collective bargaining agreements "according to ordinary principles of contract law," *as long as "those principles are not inconsistent with federal labor policy*" (emphasis added) (citing *Lincoln Mills*, 353 U.S. at 456–457)). So, we must consider the applicable federal labor law and policy scheme first, and only *then* employ general contract principles, because "the common law that the federal courts have devised to govern disputes arising out of collective bargaining contracts and ERISA plans does not coincide at every point with the general law." *Gustafson Constr. Corp.*, 258 F.3d at 649.

## B.

In this matter, the majority opinion fails to properly ground its analysis in federal labor law. In doing so, it overreads ERISA as providing a ceiling of relief for plaintiffs, rather than a floor. It introduces policy concerns that fail to capture the complete picture and ignore congressional intent. Finally, it fails to recognize the weight that we are statutorily required to give to the plain meaning of the collective bargaining agreement.

### i.

First, in analyzing the collective bargaining agreement in this matter, my colleagues in the majority overread ERISA as providing a ceiling of relief for plaintiffs.

The collective bargaining agreement is "a generalized code to govern" the relationship between labor and management. *McCormick*, 934 F.2d at 536 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 578). The agreement is multi-faceted and "will often require the employer to contribute to [a multiemployer] plan." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 138 (4th Cir. 2019). A multiemployer plan is one in which "multiple employers [from within

15

an industry] pool contributions into a single [trust] fund that pays benefits to covered retirees [or, in this case, participants] who spent a certain amount of time working for one or more of the contributing employers." *Id.* (quoting *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 698 n.1 (4th Cir. 2018)).

As such, when signing a collective bargaining agreement with a union, an employer "will also sign on to the terms and conditions of [a multiemployer] plan's separate governing documents." *Id.*; *see Ralph's Grocery Co.*, 118 F.3d at 1021 (noting that "an employer's obligation to a multiemployer plan usually arises through a collective bargaining agreement negotiated and agreed to by the employer and union"). The multiemployer plan, then, is "a third party beneficiary of the collective bargaining agreement" between an employer and a union that "can enforce the terms of a contract that inure to its benefit." *Ralph's Grocery Co.*, 118 F.3d at 1021.

Recognizing that the "[d]elinquencies of employers in making required contributions" posed a "serious problem for most multiemployer plans," Congress amended ERISA over forty years ago by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "Act"). Staff of S. Comm. on Lab. & Hum. Res., 96 Cong., 2d Sess., S. 1076, The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration 43 (Comm. Print 1980) [hereinafter Comm. Print]. The Act added to ERISA a provision, § 515, pertaining to delinquent contributions. *See* 29 U.S.C. § 1145. Section 515 requires employers that are "obligated to make contributions to a multiemployer plan" to "make such contributions in accordance with the terms and conditions of such plan or such agreement." *Id.* The Act further amended ERISA by adding

16

§ 502(g)(2), which provides plan trustees with a tool to deter unpaid contributions by rendering employers liable for interest, attorney's fees, and liquidated damages of up to 20% when the employer fails to make required contributions. *Id.* § 1132(g)(2)(C).

In this circuit, § 502(g)(2) applies only when contributions are *unpaid*, and not when they are merely "tardy." *See* Majority Op. at 7 ("We are in accord with other circuits in making this distinction and recognizing that § 502(g)(2) only applies to unpaid contributions.").[5] But my friends in the majority go too far in saying that because "ERISA does not speak to cases of tardy contributions," punitive damages in the form of liquidated damages for tardy contributions "would disregard the plain language of [§ 502(g)(2)]," such that the "common-law rule against punitive damage stands" as to tardy contributions.[6] *Id.* at 8.

That's because adhering to the plain language of § 502 reveals that it does not *prohibit* liquidated damages for tardy contributions; indeed, it does not explicitly refer to

---

[5] *See also Gustafson Constr. Corp.*, 258 F.3d at 654-55; *In re Mich. Carpenters Council Health & Welfare Fund*, 933 F.2d 376, 388 (6th Cir. 1991); *Carpenters & Joiners Welfare Fund v. Gittleman Corp.*, 857 F.2d 476, 478 (8th Cir. 1988); *Trs. of Glaziers Loc. 963 Pension, Welfare & Apprentice Funds v. Walker & Laberge Co.*, 619 F. Supp. 1402, 1405 (D. Md. 1985).

[6] I will not address the majority's denotation of liquidated damages as "punitive damages" under general contract principles or the parties' contention that the liquidated damages are penalties. *See* Majority Op. at 5, 6. In my view, classifying them as being or not being penalties is irrelevant to the analysis of collective bargaining agreements under federal labor policy. For example, in analyzing another area of federal labor law, the Fair Labor Standards Act, the Supreme Court has noted that liquidated damages "are compensation [for the employee], not a penalty or punishment." *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942); *see also* 29 U.S.C. §§ 216, 260 (codifying the court's discretion in allowing the recovery of liquidated damages for minimum wage and overtime violations pursuant to the Fair Labor Standards Act).

17

tardy contributions at all. *See* 29 U.S.C. § 1132(g). In fact, "I can find no act of Congress which expressly or impliedly prohibits [the parties] from making a contract [pursuant to a federal statute] containing a liquidated damage provision such as here involved." *Priebe & Sons v. United States*, 332 U.S. 407, 414 (1947) (Black, J., dissenting). Rather, the Supreme Court has held that while labor statutes set the boundaries of "what the parties may or may not do in certain situations," there is flexibility to consider "the penumbra of express statutory mandates" with "judicial inventiveness" to "fashion[] a remedy that will effectuate th[e] policy [of the legislation]." *Lincoln Mills*, 353 U.S. at 457. Simply put, § 502(g)(2) "does not preempt alternative contractual remedies."[7] *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 216 (9th Cir. 1989).

It also stands to reason that we need not "extrapolat[e] a general congressional intent to allow [liquidated damages] in other cases not covered by § 502(g)(2)," as the majority suggests. Majority Op. at 8. Instead, we need only look to the clearly stated intent by Congress when enacting the Act that "the specific provisions of [§ 502] concerning interest and liquidated damages *are not limitations* on the amounts otherwise set forth in collective bargaining agreements or plan documents; they constitute a minimum, not a maximum."

---

[7] While the Eighth Circuit has held that § 502(g)(2) "supplant[s] any remedy that otherwise would be available," *Gittleman Corp.*, 857 F.2d at 479 (citation omitted), the Seventh Circuit has noted that it "can't see the sense" of the *Gittleman* court's interpretation, which would "preempt[] liquidated damages for late, but not that late, contributions," because "the harm to the fund is not affected by the happenstance of when suit is brought in relation to the payment of the delinquent contributions," *Gustafson Constr. Corp.*, 258 F.3d at 655.

18

126 Cong. Rec. 23,039, 23,288 (1980) (emphasis added) (identical statements of Rep. Frank Thompson Jr. and Sen. Harrison Williams Jr.); *see also Cent. States Se. & Sw. Areas Pension Fund v. Alco Express Co.*, 522 F. Supp. 919, 928 (E.D. Mich. 1981) (noting this legislative history); *Trs. of Glaziers Loc. 963 Pension, Welfare & Apprentice Funds v. Walker & Laberge Co.*, 619 F. Supp. 1402, 1404 (D. Md. 1985) (same). The Senate Committee Print noted that the "[f]ailure of employers to make promised contributions in a *timely fashion* imposes a variety of costs on plans," and highlighted those delinquent contributions cause plans to lose investment income whenever "past due amounts" were not "received and invested on time," regardless of whether the contributions were ultimately paid. Comm. Print at 43 (emphasis added). Accordingly, the plain language of the statute does not preclude, and evidence of congressional intent informs, that § 502(g) provides a floor and not a ceiling to recovery for all delinquent contributions.

ii.

Second, in analyzing the collective bargaining agreement in this matter, the majority opinion introduces policy concerns that focus on determining whether the employers' tardiness "may be understandable." Majority Op. at 9. In doing so, the majority opinion minimizes the scale of the late payments at issue in this case, makes little sense as a justification for the rule the majority adopts, and conflicts with congressional intent.

Notably, here, Nitro was late making its contributions in *at least seventeen instances* over a fifteen-month period before the Fund brought this lawsuit under § 301.[8] *See* J.A. 59; J.A. 236–37; *cf. Idaho Plumbers*, 875 F.2d at 214 (trust fund brought suit to enforce liquidated damages when the employer was four days late with a contribution payment for one month). That number of late payments alone renders it soundly difficult to accept the tardiness in the matter as "understandable" and it would surely seem that the recourse should extend beyond the interest due. *But see* Majority Op. at 10 (holding that the only actual damages to the Fund is lost interest).

Yet, the majority opinion imports its own policy that the "statute affords the tardy company every incentive to meet its obligations to the Fund and thus avoid the more severe § 502(g)(2) penalty." *Id.* at 9. But that policy is nowhere supported by the language of the statute.

To be sure, initiating a lawsuit for excessively tardy payments is a fund's only recourse if this Court does not allow contractual liquidated damages. However, such a result was expressly disclaimed by Congress when enacting §§ 515 and 502:

> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans entitlement to the contributions. *This*

---

[8] The parties dispute the exact number of times Nitro was late, as well as the average number of days of its delinquencies. *Compare* Opening Br. at 6, *with* Response Br. at 5 n.1. Interpreting the record in the light most favorable to the Fund, *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 341 (4th Cir. 2017), Nitro was late making its monthly contributions on nineteen different occasions, including eleven contributions that were more than a week late; two contributions that were at least 20 days late; and one contribution that was more than a month late. J.A. 236.

20

> *should not be the case.* Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.

Comm. Print at 44 (emphasis added). Further, without the ability to pursue liquidated damages for tardy payments, trustees run the risk of incurring innumerable costs bringing repeated lawsuits, only to lose any prospect of recovery beyond interest if the employer should pay the late contributions after the initiation of the lawsuit but before judgment.[9]

Lastly, the majority fails to adequately balance the harm of tardy contributions for employees and other, timely employers against the possible burden of liquidated damages for delinquent employers. Majority Op. at 9. The majority opinion speaks of the "loss of jobs and possible benefits" that would result if liquidated damages were imposed for tardy contributions, as such a "draconian sanction" would "push struggling companies in the direction of insolvency." *Id.* Indeed there are policy concerns regarding the burdens on small companies and those that are financially struggling. But those policy concerns do not empower this court to override the intent of Congress to address the loss of pension and welfare benefits to employees when their plans are underfunded, as well as the plight of other employers who have to pick up the slack for delinquent employers. *Four-C-Aire*, 929 F.3d at 138 ("[I]f one participating employer fails to make a contribution to the plan . . . the remaining employers must then make larger contributions or employees must receive reduced benefits to cover the shortfall."). That much we know because the Senate took note

---

[9] While we have yet to opine on that issue, our sister circuits are split as to whether § 502(g)(2) only applies "if there were unpaid contributions on the date of the [judgment] award," or if we look to the contributions that were unpaid "at the time [the] suit [was] filed." *Mich. Carpenters Council*, 933 F.2d at 388 (taking the former view and disagreeing with cases from the Eighth and Ninth Circuits that took the latter view).

of these issues in enacting the 1980 amendments to ERISA. *See* Comm. Print at 44 ("Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates.").

And that is not all. Employer contributions to multiemployer plans could be construed as part of the wages and benefit packages provided to each employee such that an employee is not deemed fully paid until the required contributions have been made. *See United Ord. of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331, 336–37 (7th Cir. 1975) (noting that "[n]ot until the required contributions have been made will . . . employees have been 'paid in full' for their labor in accordance with the collective-bargaining agreements" (quoting *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 218 (1957))). By pursuing liquidated damages, "[t]he trustees are claiming recovery for the sole benefit of the beneficiaries of the fund [(i.e., the employees)], and those beneficiaries are the very ones who have performed the labor." *Id.* at 337 (quoting *Carter*, 353 U.S. at 220).

What needs to made clear here is that contrary to what my colleagues in the majority believe, Congress did not enact §§ 515 and 502 to address the harms to delinquent employers that could arise from permitting liquidated damages for tardy payments. Instead, those enactments address congressional concern for the harm employees and timely employers might suffer when employers do not honor their contractual obligations to pay contributions in a timely fashion. Thus, under federal labor policy, multiemployer plans

22

are entitled to the benefit on behalf of employees of reasonable liquidated damages their collective bargaining agreement imposes for late employer contributions.

iii.

Relatedly, in analyzing the collective bargaining agreement in this matter, the majority opinion fails to fully appreciate the "favored status" that this Court has held § 515 places on multiemployer plans. *Four-C-Aire*, 929 F.3d at 139 ("[Section] 515—as a statement of federal labor policy—bestows favored status on multiemployer plans, allowing them to collect contributions from employers by enforcing the contribution requirements 'in accordance with the terms and conditions' of the plan or [collective bargaining agreement]." (quoting 29 U.S.C. § 1145)); *see also Ralph's Grocery Co.*, 118 F.3d at 1023 ("According to section 515, the scope of [a c]ompany's obligation to the Fund is controlled by the plan documents and the representations that appear in the collective bargaining agreement.").

In prior decisions from this Court, we have been clear that "[i]n a collection action based on section 515, a multiemployer plan can enforce, *as written*, the contribution requirements found in the controlling documents." *Ralph's Grocery Co.*, 118 F.3d at 1021 (emphasis added) (citing *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3d Cir. 1996)); *see id.* (noting that § 515 "hold[s] employers and unions to the literal terms of their written commitments"). "In this respect, section 515 puts multiemployer plans in a *stronger position* than they otherwise occupy under common law contract principles." *Id.* (emphasis added). Thus, "even if an employer could assert a valid common law defense, *it must give way to the plain language of the [collective bargaining*

23

*agreement] or governing plan documents.*" *Four-C-Aire*, 929 F.3d at 140 (emphasis added). That principle resolves this case: regardless of what the common law has to say about liquidated damages, such damages are indisputably required by the governing plan documents.

The majority opinion suggests the liquidated-damages provisions are not valid because there was no "equality of opportunity" between the Fund and Nitro, stating that "Nitro never agreed to the liquidated damages provisions" in the trust agreements and that the Fund "unilaterally created its delinquent employer procedures." Majority Op. at 10–11 (quoting *Wise v. United States*, 249 U.S. 361, 366 (1919)). Not so. Nitro entered into a collective bargaining agreement with each of the unions and was a signatory to the provisions of the agreements requiring contribution to the Fund, and the "terms of the [collective bargaining agreement] clearly incorporated all [t]rust [d]ocuments."[10] *Four-C-*

---

[10] *See* J.A. 76–77, 87 (portions of the collective bargaining agreement between Local 625 and Nitro requiring employer contributions to the Fund "in accordance with a trust agreement between the parties . . . together with such amendments as the trustees" may adopt and obligating Nitro to "become an 'Employer' under the terms of" the trust documents "forming the various funds enumerated in" the agreement); J.A. 126 (portions of the collective bargaining agreement between Local 83 and Nitro noting that Nitro "agrees to be bound by and will sign all legally constituted trusts which have been established"); J.A. 148 (portions of the collective bargaining agreement between Local 565 and Nitro requiring Nitro to "pay all health and welfare . . . contributions" with Nitro agreeing "to be bound by the written terms of such legally established local trust agreements specifying the detailed basis on which payments are to be made into, and benefits paid out of, such trust funds"); *see also* J.A. 415–21 (signature pages of the collective bargaining agreements between the unions and Nitro); J.A. 163, 203–205 (portions of the trust agreement noting the trustees will be comprised of union representatives and employer representatives who will adopt the procedure for delinquent employer contributions including the collection of liquidated damages).

*Aire*, 929 F.3d at 150. "'[B]y virtue of [§] 515' the Fund was entitled to 'rely on and enforce the literal meaning of [Nitro's] representation' that it would agree to abide by the terms of the [t]rust [d]ocuments and any amendments thereto." *Id.* at 150–51 (quoting *Ralph's Grocery Co.*, 118 F.3d at 1023–24). Further, "[Nitro's] acceptance of the terms set forth in [the trust] documents," as incorporated by the collective bargaining agreement, "form[ed] the basis for [its] relationship with the Fund." *Id.* at 151 (quoting *Ralph's Grocery Co.*, 118 F.3d at 1024). Our case law confirms that "congressional policy [codified in § 515] provides that multiemployer pension plans like the Fund are entitled to enforce the terms of their plans uniformly." *Id.* at 151.

In line with our precedents interpreting § 515, "even if an employer could assert a valid common law defense, it must give way to the plain language of the [collective bargaining agreement] or governing plan documents." *Id.* at 140. Here, Nitro "is bound to the terms of the collective bargaining agreement to which it is a party and which incorporates the respective trust agreements by reference," and therefore, should be "subject to liquidated damages provided in the trust agreements." *Walker & Laberge Co.*, 619 F. Supp. at 1405 (affirming liquidated damages of 20% for tardy contributions for five months because employer was bound to the terms of the agreements); *see also Gustafson Constr. Corp.*, 258 F.3d at 652, 654–55 (reversing district court's refusal to award liquidated damages of 20% to which the parties had agreed).

25

## II.

In sum, the terms of a collective bargaining agreement should be analyzed under federal labor policy, including the statutory obligations of employers. Federal labor policy favors multiemployer plans and sanctions the use of liquidated damages. Because the decision reached by the majority opinion is consistent with neither federal labor policy, nor this Court's precedents, I must, respectfully, dissent.